**GULF STATES UTILITIES COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Union Carbide Corporation, Intervenor.**

No. 88–1071.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1988.

Decided April 14, 1989.

Daniel L. Koffsky, with whom Wm. War-field Ross and Jane Seigler, Washington, D.C., were on the brief, for petitioner.

Joseph S. Davies, Atty., FERC, with whom Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., FERC, Washington, D.C., were on the brief, for respondent.

Philip A. Fleming, Washington, D.C., was on the brief for intervenor.

Before STARR, BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Cogeneration facilities are designed to meet the thermal and electrical energy needs of particular commercial and industrial consumers. Congress requires electrical utilities to provide qualifying cogeneration facilities with standby "back-up" power. Gulf States Utilities Company challenges a Federal Energy Regulatory Commission finding that a Union Carbide Corporation plant is entitled to receive back-up power even though the electricity it receives must be transmitted 1.7 miles from a cogeneration facility that Union Carbide owns jointly with another company. At issue in this case is the Commission's characterization of the Union Carbide plant as the consuming component of a qualifying cogeneration facility although it neither uses the steam generated by the facility nor is located adjacent to it. Because we conclude that the Commission failed to provide an adequate explanation of its ruling, we remand the case for further consideration.

## I. BACKGROUND

### A. Applicable Statute and Regulations

" 'Cogeneration' involves the joint production of electricity and useful heat or steam, in circumstances where some or all of the heat would otherwise be dissipated into the environment." *Puerto Rico Elec. Power Auth. v. FERC ("PREPA")*, 848 F.2d 243, 244 (D.C.Cir.1988).

In response to the energy crisis of the 1970's, Congress sought to encourage the use of cogeneration as an energy conservation measure. Among the impediments to such use identified by Congress were the reluctance of electric utilities to purchase surplus electricity produced by cogeneration facilities and to provide them with a supplementary source of power. *PREPA* at 244–45. As a result, when Congress enacted the Public Utility Regulatory Policies Act of 1978 ("Act"), it included a provision directing the Federal Energy Regulatory Commission ("FERC") to prescribe rules under which electric utilities would be required to provide back-up power to, and purchase surplus power from, "qualifying cogeneration facilities" ("QFs"). 16 U.S.C. § 824a–3(a) (1982).

The Act defines a "cogeneration facility" as one that produces

(i) electrical energy, and

(ii) steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating or cooling purposes.

*Id.* § 796(18)(A). A "qualifying cogeneration facility" is one that

(i) the Commission determines, by rule, meets such requirements (including requirements respecting minimum size, fuel use, and fuel efficiency) as the Commission may, by rule, prescribe; and

(ii) is owned by a person not primarily engaged in the generation or sale of electric power (other than electric power

solely from cogeneration facilities or small power production facilities).

*Id.* § 796(18)(B).

The Commission's regulations specify two prerequisites for certification as a QF. First, the facility must meet certain operating and efficiency standards. 18 C.F.R. § 292.205(a) and (b) (1988). Second, no more than a fifty percent interest in a facility may be owned by an electric utility, a group of electric utilities, or an electric utility holding company. *Id.* § 292.206. The regulations also require that electric utilities both purchase excess energy from QFs and provide them with back-up power. *Id.* §§ 292.303 and 292.305(b)(1).

B. The Facts

Union Carbide Corporation and Fina Oil and Chemical Company ("Fina") agreed to form a partnership, to be called "Fin–Lin," that would establish and operate a cogeneration facility at a site adjacent to the Fina plant in Port Arthur, Texas. In 1987, pursuant to procedures established by it (*see id.* § 292.207), the partners filed a joint application with FERC asking that the proposed Fin–Lin plant be certified as a QF. The application stated that the facility would provide Fina with electrical power and steam and would transmit electrical power, but not steam, to the Union Carbide plant located 1.7 miles away in Groves, Texas. The partners stated that Fin–Lin would construct the proposed facility but, for tax and other reasons, might sell it to a third party that would then lease it back to Fin–Lin. Fin–Lin would oversee the facility's management, but Fina would run its day-to-day operations on behalf of Fin–Lin.

Over Gulf States' objection, the Commission concluded that the Fin–Lin facility, the Fina oil plant in Port Arthur, and the Union Carbide plant in Groves were all components of a QF, that transfers of power among the owners of a facility did not disqualify it from receiving QF status, and that the Fin–Lin facility was entitled to the benefits of that status. Accordingly, in September 1987, FERC issued an order granting Union Carbide's and Fina's application for certification as a QF, *Union*

*Carbide Corp. and Fina Oil and Chem. Co.,* 40 F.E.R.C. ¶ 61,337 (1987) ("Certification Order"). Subsequently, in denying Gulf States' request for rehearing, FERC asserted that "the consuming entities here are entitled to back-up power" and that it "refuse[s] to draw an artificial distinction between the consumption and production of cogeneration energy where the two are a unitary and reciprocal process, and are formally given separate corporate status only for financial and tax purposes." Order Denying Rehearing, 41 F.E.R.C. ¶ 61,348 at 61,924 (1987).

Gulf States petitioned for review of the two orders. Shortly before its petition was scheduled to be heard, FERC moved for summary affirmance on the ground that our recent decision in *PREPA* was dispositive of Gulf States' claim.

II. DISCUSSION

In *PREPA*, which issued after FERC's decision in this case, this court considered the propriety of the grant of QF status in a situation where, because of tax and other considerations, the plant that consumed cogenerated energy and the adjacent facility that produced it were separately owned. In that case, O'Brien Energy Products, Inc. owned and operated the cogeneration facility that supplied electricity and thermal energy to a pharmaceutical manufacturing plant owned by Alcon, Inc. O'Brien and Alcon were "separate corporations, evidently not affiliated." 848 F.2d at 245. O'Brien had leased the site of the energy producing plant from Alcon. Under the terms of the lease, O'Brien had sole responsibility for constructing, operating, and maintaining the plant. At the end of the five-year lease, Alcon had the option of renewing the lease, purchasing the facility for its residual value, or requiring O'Brien to remove the facility from the property. *Id.*

The Puerto Rico Electric Power Authority argued that its duty to provide back-up power extended only to the O'Brien-owned cogeneration facility. The Commission determined, however, that Alcon was entitled to back-up power because the back-up pro-

vision of section 210 of the Act "covers both the production and consumption functions, irrespective of whether they have the same ownership." *Alcon (Puerto Rico), Inc.,* 38 F.E.R.C. ¶ 61,042 at 61,120 (1987). In *PREPA,* we agreed that the divided ownership did not disqualify Alcon because its arrangement with O'Brien represented the kind of integrated operation that Congress intended to encourage:

> O'Brien's generating equipment will be built on Alcon's land directly adjacent to the pharmaceutical plant; it will supply only Alcon's plant; it will generate both electricity and useful thermal energy; and Alcon is given the option to purchase the generating equipment from O'Brien at the expiration of the five-year lease. Given the "close nexus," it was altogether reasonable for the Commission to view the QF concept as encompassing both the producing and the consuming components of such a project.

848 F.2d at 248.

The Commission contends that our decision in *PREPA* controls this case although it acknowledges two distinctions in the underlying facts. First, unlike the case in *PREPA,* the consumers of the energy produced by the Fin–Lin facility own and operate the plant. In its brief and at oral argument, FERC emphasized that Union Carbide's co-ownership of the cogeneration component made the case for certification all the more compelling. Second, one of the consumers, Union Carbide, is located 1.7 miles away from, rather than adjacent to, the energy producing component. FERC dismisses this fact as inconsequential: the statute does not specifically require that a QF's energy producing and consuming components be located cheek to jowl, and an insistence on such proximity would undermine the Act's objective of encouraging cogeneration.

By contrast, Gulf States finds these two differences to be decisive. It argues that Union Carbide cannot be considered an energy consuming component of the Fin–Lin project because the "close nexus" to which we refer in *PREPA, id.,* does not exist here: the electricity Union Carbide con-

sumes is produced not next door, but at a site almost two miles away; furthermore, Union Carbide consumes only the electricity produced by the Fin–Lin facility, and not the thermal energy that is an essential component of cogeneration. Thus, Gulf States maintains, Union Carbide's relationship to the facility is essentially that of a retail purchaser of surplus electricity rather than that of a "consuming component" of a cogeneration project. Accordingly, Gulf States concludes it may not be required to provide Union Carbide with back-up power because the latter lacks the "close nexus" between energy producing and consuming components on which we based our decision in *PREPA. Id.*

■ Both parties treat the passage from which the phrase "close nexus" is taken with excessive reverence. That passage, which is quoted at page 490 above, applied specifically to the facts in *PREPA* and should not be regarded as a checklist for determining whether other arrangements will qualify for certification as QFs. It is not for us to establish authoritative criteria for determining whether a particular set of facts will qualify a cogeneration project for certification. That responsibility rests with the Commission.

■ Unfortunately, in this case, we are unable to find in the Commission's orders, or in its brief, a coherent explanation for its determination that the Union Carbide plant is so integral a part of the Fin–Lin facility as to entitle it to back-up power from Gulf States. The Commission alluded, in its Certification Order, to the fact that multiple ownership of a facility poses no obstacle to certification. 40 F.E.R.C. ¶ 61,337 at 62,031. It also noted, in its Order Denying Rehearing, that it would not draw an "artificial distinction between the consumption and production of cogeneration energy where the two are a unitary and reciprocal process." 41 F.E.R.C. ¶ 61,348 at 61,934. The Commission fails to indicate, however, why it would have been artificial to distinguish the Union Carbide plant from that of its Fina partner, which is adjacent to, and a prospective consumer of both forms of energy to be pro-

duced by, the Fin–Lin facility. We express no opinion on the matter but merely point out that it is not enough, in support of a conclusion, to cite another conclusion.

### III. CONCLUSION

Because the Commission has failed to explain the basis for its decision, we deny FERC's motion for summary affirmance, grant Gulf States' petition for review, and remand the case to the Commission for further consideration. We urge the Commission to take the occasion to discuss the criteria it will be applying with sufficient specificity to provide guidance for the future. We do not suggest what lines might be drawn, or where. That is the Commission's responsibility.

*So ordered.*