**GULF STATES UTILITIES COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Union Carbide Corporation, Intervenor.**

No. 90–1006.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1990.

Decided Jan. 11, 1991.

William Warfield Ross, with whom Richard B. Herzog, James M. Guinivan and Donald M. Clements, Jr., were on the brief, for petitioner.

Joseph S. Davies, Deputy Sol., F.E.R.C., with whom Timm L. Abendroth, Atty., F.E.R.C., was on the brief, for respondent. Catherine Cook, Atty., F.E.R.C., also entered an appearance for respondent.

Philip A. Fleming, with whom Toni M. Fine was on the brief, for intervenor Union Carbide Corp. and amicus curiae Electricity Consumers Resource Council urging that the petition for review be denied. Sara D. Schotland also entered an appearance for amicus curiae.

Edward H. Comer was on the brief for amicus curiae Edison Elec. Institute urging that the petition for review be granted. Peter B. Kelsey also entered an appearance for amicus curiae.

Before RUTH BADER GINSBURG, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case is here for the second time. Petitioner continues to challenge

FERC's grant of "qualifying facility" (QF) status under the Public Utilities Regulatory Policies Act of 1978, 16 U.S.C. § 796(18)(A) (the Act) to a partnership of Union Carbide Corporation and Fina Oil and Chemical Company (Fin–Lin) that would establish a cogeneration operation. Union Carbide will be part owner of the partnership that would operate the cogeneration plant, but the actual running of the day-to-day operations would be done by Fina. Last year we remanded the case to FERC because we did not believe it had adequately explained what constituted a "facility" eligible for QF status under the Act. *Gulf States Utilities Co. v. FERC,* 872 F.2d 487 (D.C.Cir.1989). FERC tried again and we believe the criteria it announced and applied in this case withstand our review. We therefore deny the petition.

I.

■ Since the background of the Act (sometimes called PURPA), and the details of the proposed operation are set forth in our previous opinion, we will not repeat them. Suffice it to say that petitioner trains its fire on two circumstances of this partnership. It objects that the power-producing cogeneration unit will be located adjacent to Fina's refinery, which is its power-consuming unit, whereas Union Carbide's power-consuming plant will be located 1.7 miles away and that Union Carbide will take only electricity from the cogeneration operation, not steam. In other words, Gulf States, the public utility which supplies Union Carbide with electricity, objects to Union Carbide's inclusion under the QF umbrella because it will thereby lose part of its customer franchise. In addition, under FERC's regulations, Gulf States must purchase from the QF any surplus power the QF produces at the utility's avoided marginal cost and provide back-up power to Fina and Union Carbide. *See American Paper Institute v. American Elec. Power Corp.,* 461 U.S. 402, 103 S.Ct. 1921, 76

L.Ed.2d 22 (1983). Gulf States claims that Congress never intended these incentives for the development of cogeneration facilities at the location of a plant that produces energy as a byproduct of its normal operations to be made available through a cooperative venture with another plant some distance away.[1]

We remanded the case to FERC because we did not understand why it had rejected petitioner's argument that the distance between Union Carbide's plant and the cogeneration operation's physical location in combination with the fact that Union Carbide was taking only electricity, but not steam from the operation, made Union Carbide "essentially ... a retail purchaser of surplus electricity." *Gulf States,* 872 F.2d at 490. What was it about this proposed venture that made Union Carbide's plant "so integral a part of Fin–Lin facility as to entitle it to backup power from Gulf States"? *Id.* In so asking, of course, we were inquiring what were the limits the Commission perceived to grants of QF status or, to put it another way, what limits were implied by the word "facility"?

The Commission, on remand, was somewhat more expansive. It said that in this case it determined that Union Carbide was an "integral component" by relying upon four factors.

1. Union Carbide was a part owner of the power producing component as well as a consumer.

2. Union Carbide's plant 1.7 miles away is in "close proximity."

3. The power line used to transmit electrical power to Union Carbide is a private line indicating that the Union Carbide plant is a "part of an integrated industrial operation."

4. There was a longstanding supplier-customer relationship between Union Carbide and Fina before they entered into this joint venture. The former sold the latter nitrogen.

---

1. Petitioner also argues that FERC has violated the Act by implicitly authorizing an actual retail sale of power from Fin–Lin to Union Carbide. In *Puerto Rico Elec. Power Auth. v. FERC,* 848

F.2d 243 (D.C.Cir.1988), however, we said that whether or not that transaction was a retail sale was not properly before us; it should be raised first before the state regulatory agency.

*Union Carbide Corp.*, 48 FERC ¶ 61,130, *reh'g denied*, 49 FERC ¶ 61,209 (1989).

## II.

Petitioner contends that the Commission's explanation will not do. It argues first that the Commission is ignoring the plain meaning of the word "facility," which cannot be stretched to include a multiplant operation, particularly where one of the consuming participants is 1.7 miles away. It would appear, however, that we have already rejected this contention; we would not have remanded for a further explanation of the Commission's determination if we had thought the word "facility" could not bear the meaning which the Commission gives it in this case. In any event, the word "facility" is not defined in the statute, nor in the legislative history, and we do not think it has a "plain meaning" that would preclude its application to this arrangement. Like "stationary source," it is an imprecise term that an administrative agency is given implicit authority to construe, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), and we must therefore defer to a reasonable interpretation and application of such a term.

Of course there remains the question whether the Commission's four factor test is a reasonable interpretation and application of the statute. It is common ground for the parties that the word "facility" is not unbounded. The Commission seems to acknowledge that multiple plants at an industrial park, for instance, could not form a cogeneration joint venture, bound together only by relative propinquity and a shared objective of producing energy more cheaply than the local utility company. Therefore, although Congress did not explicitly set the outer boundaries of a facility eligible for QF status, there seems agreement that a boundary exists even

though its outline is only dimly perceived. The Commission understandably does not wish to attempt to draw those boundaries categorically, but rather would prefer to proceed on a case-by-case basis—which an administrative agency is clearly entitled to do. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

Nor can we say that the four factors the Commission relied upon to distinguish this case from other hypothetical situations are not reasonably related to a definition of facility under the Act. We have previously approved the Commission's determination that the owner of the cogeneration power unit need *not* be the same company that consumes the generated energy. *See Puerto Rico Elec. Power Auth. v. FERC*, 848 F.2d 243, 247–48 (D.C.Cir.1988) (*PREPA*). But we do not think it irrational for the Commission to look to a common ownership link between the producing and consuming elements where, as here, one of the consuming plants is some distance away.[2] Similarly, the extent of physical separation of the putative facility's parts seems quite relevant to a determination as to whether the parts are "integrated."

Petitioner asserts that the third factor—the private line carrying electricity to Union Carbide—is merely a necessary incident of a QF, not a relevant criterion in determining whether the operation is sufficiently integrated to be regarded as a "facility." We see petitioner's point; presumably, Fin–Lin could not very well ask petitioner to transport electricity to Union Carbide. The private line may not be a true variable which can be used to measure the degree of integration of this operation. Nevertheless, the need for a private line does suggest a real limitation on QF status because only ventures with the land use rights and physical ability to run lines between production and consuming units would qualify. Petitioner would prefer that FERC limit

2. The partnership agreement also provides for the possibility of sale-leaseback arrangements by Fin–Lin or either of its two partners. The Commission expressed its approval of a possible change in ownership for "financial" reasons, *see* 48 FERC ¶ 61,130 at p. 61,506, but our under-standing, based on the representation at oral argument, is that the Commission misspoke and meant "financing" reasons similar to those approved in *PREPA*, *see* 848 F.2d at 248–49, and mentioned repeatedly in the Commission's previous decisions in this case.

QF status to ventures with consuming units that take steam as well as electricity because steam cannot be transported as far from the production unit as can electricity. That approach might well be reasonable, but FERC did not adopt it and we cannot say that the Commission was obliged to do so. The truth is that the task of measuring the degree of integration between production and consuming units is not susceptible to any bright line rules—petitioner's counsel was not able to suggest one—and therefore we are hardly in a position to reject the Commission's reasoning.

Finally, that Union Carbide is a long-term supplier of nitrogen to Fina may not, as petitioner argues, have any direct bearing on the operation of the cogeneration power unit; nevertheless it also serves as a factor which marks off the economic relationship between Union Carbide and Fina as something more than a joint venture for the sole purpose of gaining QF status.

\* \* \* \* \* \*

To be sure, multifactor tests are subject to manipulation. They often serve more to obscure a tribunal's reasoning than to illuminate it, and thereby do not always cabin a tribunal's future discretion. But the judiciary is hardly in a position to throw stones at the technique. We admit that we are not entirely comfortable with the Commission's reasoning and we certainly do not mean to suggest that the Commission is totally free to bestow QF status on all sorts of loose arrangements of cooperating plants—thereby undermining the customer base of public utilities. But although we are unable to determine the outer boundaries of the statutory concept, it does not appear that the Commission's present decision exceeds the limits of its discretionary authority and we, therefore, defer to its rather painful efforts to explain its approval of this application.