In re James R. BOYKINS, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 426147).

No. 08–BG–869.

District of Columbia Court of Appeals.

Argued May 27, 2010.
Decided July 29, 2010.

See also, 748 A.2d 413.

James Benny Jones, Jr. for respondent.

Ross T. Dicker, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before THOMPSON and OBERLY, Associate Judges, and BELSON, Senior Judge.

OBERLY, Associate Judge:

This case is before us on a report and recommendation from the Board on Professional Responsibility concerning respondent, James R. Boykins. We accept the Board's recommendation that respondent be suspended from the practice of law for two years. We reject, however, the Board's recommendation that a practice monitor be used to determine whether respondent is fit to resume the practice of law. Rather, we order that respondent's reinstatement be conditioned upon a showing of fitness established by clear and convincing evidence in accordance with D.C. Bar Rule XI, § 16.

## I. Background

### A. Facts

The misconduct at issue in this case arises from two unrelated settlements of personal injury matters that respondent handled for two clients in the fall of 1998. The first client, Ericka Obeng, settled her claim with respondent's assistance for $3,300. The settlement provided for a disbursement of $1,150 to respondent to cover his fees and expenses, $1,550 to Ms. Obeng, and $600 to a doctor who had seen Ms. Obeng. In November 1998, respondent and Ms. Obeng endorsed the settlement check, and respondent deposited it in

his trust account. On December 4, respondent issued checks to Ms. Obeng and to the doctor in the full amounts they were due under the settlement.

Ms. Obeng's check was lost, so on December 9 respondent executed a stop-payment order and issued a replacement check from his trust account for $1,525 (the $25 reduction was to cover the stop-payment fee charged by the bank). When Ms. Obeng tried to cash the check on December 21, however, it was refused for insufficient funds. Approximately one month later, respondent issued a third check to Ms. Obeng in the amount of $1,530 to replace the dishonored check. (Respondent could not explain why the check was for $5 more than the previous check.) The bank honored this check when Ms. Obeng presented it.

The second settlement at issue in this case involves respondent's representation of Donald Green in connection with a car accident in which the latter was injured in June of 1998. Two medical providers—a Dr. Bovell and Washington Open MRI—treated Mr. Green for the injuries he suffered in the accident. Dr. Bovell charged Mr. Green $635, and Washington MRI charged Mr. Green $1,076. In Assignment and Authorization (A & A) forms that respondent's paralegal signed on his behalf, respondent agreed to pay the providers directly out of the proceeds of any settlement recovery. Respondent also promised to notify the providers in writing about the status of their claims within 10 days of a request for information.

Mr. Green settled his claim with his insurance company for $3,500 in November 1998. On December 4, Mr. Green and respondent endorsed the settlement check, and the check was deposited in respondent's trust account—the same account in which the Obeng settlement funds had been deposited. Respondent's office then prepared a settlement sheet providing for a distribution of, as relevant here, $1,166.67 to respondent as a contingent fee, $150 to respondent as a fee for preparing a Personal Injury Protection (PIP) claim application, and $2,167.13 to Mr. Green. Consistent with the A & As, the settlement sheet also provided for distributions to Dr. Bovell and Washington MRI in the full amounts due each provider. (There also was a third provider who was a beneficiary of the Green settlement, but payments to that provider are not at issue here.)

On December 4, the same day that the Green settlement check was deposited in respondent's trust account, respondent issued a check to Mr. Green for $2,167.13—the amount stated in the settlement sheet. Contrary to what he stated in the A & As, however, respondent did not reimburse either Dr. Bovell or Washington Open MRI, and notified neither provider that he had received the settlement funds. Instead, respondent's office submitted the PIP claim to Mr. Green's insurance company on behalf of Mr. Green, seeking the amount that the providers were due for their services in treating Mr. Green. In January 1999, respondent received four PIP checks payable to Mr. Green for the full amount requested. Respondent did not reimburse the medical providers from those funds.

On December 4, 1998—the same day that he issued checks to Mr. Green and Ms. Obeng—respondent also issued a check to himself for $2,267. This sum represented respondent's $1,100 fee for Ms. Obeng's case and his $1,166.67 fee for Mr. Green's case. Respondent did not itemize the fee for each case. Respondent subsequently issued three additional checks to himself: (1) a check for $750, dated December 9 (the same day as the replacement check to Ms. Obeng was is-

sued), stating that it was for attorneys' fees in the Green case; (2) a check for $300, dated December 14, which stated on the check stub that it was for "expenses in Green," but on the check itself that it was a "reimbursement in Donald Green and Ericka Obeng"; and (3) a check for $500, also dated December 14, which stated on the check stub, "expense for Green." In total, respondent paid himself $3,817— roughly $1,300 more than the amount to which he was entitled according to the settlement sheets—for his services in the Green and Obeng matters. It was because of this overpayment to himself that respondent had insufficient funds in his trust account, causing the bank to refuse to honor the December 9 check that respondent issued to Ms. Obeng.

The bank promptly notified Bar Counsel of the overdraft, and Bar Counsel opened a formal investigation into respondent's handling of his trust accounts shortly thereafter. Bar Counsel first contacted respondent, however, in 2002. Over the next several years, respondent gave inconsistent explanations for the overdraft. First, respondent provided a document from the bank stating that the check had been dishonored erroneously. Later, respondent suggested to Bar Counsel that the stop-payment order for the initial check to Ms. Obeng might explain the bank error. After that, respondent told Bar Counsel that a bank representative had told him that she had forgotten to deposit a check from respondent, and that caused the trust account to have insufficient funds. Ultimately, at the March 2007 hearing before the Hearing Committee of the Board, respondent admitted that he was unable to determine why the overdraft had occurred.

Bar Counsel began to investigate respondent's conduct in the Green case in June 2003, about two weeks after Wash-ington Open MRI sent respondent a fax inquiring about the $1,076 that it was owed for treating Mr. Green in 1998 (and which funds respondent received from Mr. Green's insurance company in January 1999). On June 9, Bar Counsel requested from respondent "copies of documents indicating that Mr. Green's bills were paid from his settlement funds." On June 19, respondent replied that, "as best as [he could] recall," the PIP "insurance carrier paid Mr. Green," and that Mr. Green "paid" the providers. Respondent agreed that he "signed both A & As" (in which he promised to pay the providers), but assured Bar Counsel that "the bills were paid." Respondent testified before the Hearing Committee that at some point after he sent this letter to Bar Counsel, he called Mr. Green's wife to ask her whether the medical bills had been paid and learned that they had not. On August 4, respondent informed Bar Counsel by letter that he was in contact with Washington Open MRI and that he was "sending the payment from [his] personal funds since [he was] ultimately responsible." Respondent also stated in the letter that "Dr. Bovell was paid."

In September 2003, Bar Counsel asked respondent to explain how he had handled Mr. Green's four PIP checks. Respondent replied that he would provide Bar Counsel an affidavit, executed by Mr. Green, to verify that the four PIP checks that he had obtained for Mr. Green "were given directly to Mr. Green," who "picked them up from [respondent's] office." Respondent also represented that he had "spoke[n] with Mr. Green," and that Mr. Green "remember[ed] the incident." And, indeed, in December 2003 respondent provided to Bar Counsel an affidavit signed by Mr. Green, in which Mr. Green averred that he had picked up the PIP checks.

One year later, in December 2004, Bar Counsel informed respondent that bank

records revealed that the PIP checks had been "deposited in one of [respondent's] bank accounts in January 1999, and not given to Mr. Green as [respondent] earlier advised." Respondent answered that he could not remember "precisely what happened" because it had been so long but that he knew that the funds did not come to him. "It appears funds were placed in my business account but they ultimately went to Mr. Green," respondent explained. On April 20, 2005, respondent informed Bar Counsel that Mr. Green had signed the PIP funds over to him. Respondent explained that Mr. Green "owed [him] money for a favor [respondent] did for his wife," and stated that Mr. Green repaid him "when he received his PIP funds." Respondent had no records to document either the loan or Mr. Green's agreement to sign over the PIP checks.

## B. Procedural History and Recommended Sanctions

■ In 2006, Bar Counsel brought before the Hearing Committee seven charges against respondent arising out of his handling of the Obeng and Green matters. The Committee found that in Ms. Obeng's case, respondent violated Rule 1.15(a) of the D.C. Rules of Professional Conduct [1] by negligently misappropriating Ms. Obeng's property. The Committee concluded, however, that Bar Counsel failed to establish by clear and convincing evidence its second charge with respect to Ms. Obeng—*i.e.,* that respondent violated Rule 1.15(a) and D.C. Bar R. XI, § 19(f) [2] by "[f]ailing to establish and maintain complete records reflecting his handling of the settlement funds of [Ms. Obeng], and failing to preserve these records for five years after the termination of the representation."

In respect to the counts pertaining to Mr. Green, the Committee found that respondent violated Rule 1.15(a) and D.C. Bar R. XI, § 19(f), and Rule 1.15(b) [3] in the manner in which he handled the portion of the settlement funds that was due to Dr. Bovell and Washington MRI—the

---

1. Rule 1.15(a) requires every attorney to "hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in a financial institution. . . ." A misappropriation of funds includes any unauthorized use of funds, including temporary use, regardless of any personal benefit or gain. *In re Edwards,* 808 A.2d 476, 482 (D.C.2002) (*Edwards I* ) (citing *In re Harrison,* 461 A.2d 1034, 1036 (D.C. 1983)).

2. Rule 1.15(a) also requires that if the attorney is holding funds or property of a client or third person, "[c]omplete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation." D.C. Bar R. XI, § 19(f) similarly states: "Every attorney subject to the disciplinary jurisdiction of this Court shall maintain complete records of the handling, maintenance, and disposition of all funds, securities, and other properties belonging to another person, or to a corporation, association, partnership, or other entity, at any time in the attorney's possession, from the time of receipt to the time of final distribution, and shall preserve such records for a period of five years after final distribution of such funds, securities, or other properties or any portion thereof."

3. Rule 1.15(b) states: "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property, subject to Rule 1.6."

two providers who had treated Mr. Green. The Committee found that Bar Counsel did not establish through clear and convincing evidence that respondent knowingly and fraudulently interfered with Bar Counsel's investigation in violation of Rules 8.1(a),[4] 8.4(c)[5] and 8.4(d).[6]

In its sanction recommendation, the Committee proposed that respondent be suspended from the practice of law for six months for negligently misappropriating Ms. Obeng's funds. *See In re Cater,* 887 A.2d 1, 25 (D.C.2005) ("While negligent misappropriation typically merits a suspension of six months, reckless or intentional misappropriation almost always warrants disbarment."). The Committee acknowledged that Bar Counsel also established that respondent violated three rules in conjunction with his representation of Mr. Green, but reasoned that these violations did not warrant an additional sanction because "none of [the] violations involved intentional misconduct or dishonesty." Emphasizing respondent's contrition at the hearing, the Committee also declined to recommend a fitness requirement. Last, the Committee recommended that respondent be required to complete a Continuing Legal Education ("CLE") course "concerning the handling of entrusted funds as a condition of his reinstatement following his suspension."

Bar Counsel filed exceptions to the Hearing Committee's findings and recommended sanction, and the matter came before the Board. The Board adopted the Committee's finding that respondent violated Rule 1.15(a) by negligently misappropriating funds in his trust account that belonged to Ms. Obeng. As for the Green matter, the Board agreed with the Committee that respondent (1) violated Rule 1.15(a) and D.C. Bar Rule XI, § 19(f) by failing "to keep records sufficient to account for his handling of Mr. Green's PIP checks or the assigned claims of Mr. Green's medical services providers"; and (2) violated Rule 1.15(b) by failing promptly to notify and pay Mr. Green's medical providers from the settlement proceeds.

In addition to adopting these findings of the Committee, the Board found additional violations that the Committee had not found. Most significantly here, the Board concluded that respondent violated Rule 8.1 and Rule 8.4 in the course of Bar Counsel's investigation into the handling of funds in the Green matter. (Of less import, the Board concluded, contrary to the Committee, that respondent violated the record-keeping requirements of Rule 1.15(a) and D.C. Bar R. XI, § 19(f) in the Obeng matter.)

As the basis for its finding of the violations related to Bar Counsel's investigation, the Board focused first on respondent's June 19, 2003, letter in which he wrote to Bar Counsel that the PIP insurance carrier "paid" Dr. Bovell and Washington Open MRI. Respondent's statement in that letter that the "bills were paid" was wrong; respondent did not pay Dr. Bovell and Washington Open MRI until July and mid-August of 2003, respectively. As the Board pointed out, when respondent assured Bar Counsel that the providers were "paid," he "ignored evidence he had only

---

4. Rule 8.1(a) bars attorneys from "knowingly mak[ing] false statement[s] of fact" in connection with a disciplinary matter.

5. Rule 8.4(c) states that it is professional misconduct for a lawyer to "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

6. Rule 8.4(d) states that it is professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice."

recently received in the form of a fax from Washington Open MRI that gave him clear notice of that facility's claim of non-payment." More than that, instead of "attempting to confirm the accuracy of his memory (or establishing an error in the fax he had so recently received)," and without even "contact[ing] his clients," respondent simply "relied solely upon his memory of events more than four years past." On these facts, the Board concluded that respondent recklessly made false statements to Bar Counsel, in violation of Rule 8.4(c), which prohibits lawyers from engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation." *See In re Hager*, 812 A.2d 904, 916 (D.C.2002) (observing that "[w]e have given a broad interpretation to Rule 8.4(c)" and that "sufficiently reckless conduct is enough to sustain a violation of the rule") (citations omitted).

The Board also concluded that respondent violated Rule 8 when he falsely represented to Bar Counsel that Mr. Green remembered picking up the PIP checks, and that he would be providing an affidavit executed by Mr. Green to that effect. Respondent, the Board pointed out, provided the affidavit to "corroborate" his earlier representation to Bar Counsel that paying the providers had been Mr. Green's responsibility. And, to "bolster[ ]" the credibility of that affidavit, in October 2003, respondent wrote to Bar Counsel that he had "spoke[n] with Mr. Green," and that the latter "remember[ed]" picking up the PIP checks. Yet when respondent testified before the Committee, he conceded that Mr. Green had *not* remembered picking up the PIP checks; rather, respondent explained, Mr. Green agreed to sign the affidavit only because respondent had told him "it's a habit that people picked [PIP checks] up." But the affidavit was, in the Board's words, "silent about Mr. Green's lack of memory or any basis for the statements made" regarding the PIP checks. Furthermore, bank records demonstrated that respondent deposited the PIP checks in his own account, which flatly contradicted what Mr. Green averred at respondent's behest in the affidavit. The Board concluded that by misleading Bar Counsel about Mr. Green's recollection of events, respondent knowingly made a false statement of material fact in connection with a disciplinary matter in violation of Rule 8.4(c). In addition, the Board found that in making this statement respondent violated Rule 8.1(a), which makes it professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct."

Finally, the Board concluded that by making both false statements—the recklessly false representation in the June 19 letter that Mr. Green's providers had been paid, and the knowingly false statement in the October letter that Mr. Green remembered picking up the checks—respondent violated Rule 8.4(d), which prohibits lawyers from "engag[ing] in conduct that seriously interferes with the administration of justice."

As for sanctions, the Board recommended to this court that respondent be suspended from the practice of law for two years, not for six months as the Hearing Committee thought appropriate. The Board rejected, however, Bar Counsel's recommendation that respondent's reinstatement to the Bar be conditioned on proof of his fitness to practice law in accordance with D.C. Bar R. XI, § 16. Nonetheless, the Board did find it necessary to impose conditions on respondent's reinstatement. Thus, the Board recommended that respondent accept the assistance and advice of a practice monitor at least sixty days before the end of the suspension, and that respondent be required to cooperate with the practice monitor as a condition of

reinstatement. The Board envisioned that at least thirty days before the conclusion of the suspension, the practice monitor would "submit a report to the Board, with a copy to Bar Counsel, stating his or her opinion of respondent's level of proficiency regarding proper compliance with D.C. Bar R. XI, § 19(f)." If the practice monitor were to report that respondent was "substantially deficient" regarding his methods of record keeping, respondent would then be required to demonstrate his fitness to resume the practice of law through the standard procedure pursuant to D.C. Bar R. XI, § 16, the specifics of which we elaborate upon later. The Board also recommended that respondent attend three hours of CLE courses concerning the handling of entrusted funds.

Respondent failed to file a timely exception to the Board's report or to its sanction recommendation. Bar Counsel opposes only the Board's recommendation that a practice monitor be used at the end of respondent's suspension. Instead, Bar Counsel contends that respondent should be required, "upon expiration of the two-year suspension, to establish by clear and convincing evidence that he is fit to resume the practice of law."

## II. Standard of Review

■ Under D.C. Bar R. XI, § 9(h), we "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Accord, In re Cleaver–Bascombe*, 986 A.2d 1191, 1194 (D.C.2010) (*Cleaver–Bascombe II* ); *In re Elgin*, 918 A.2d 362, 373 (D.C.2007). Thus, if the "Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *Cleaver–Bascombe II*, 986 A.2d at 1194 (quotation marks omitted). But although "we owe respect to the considered judgment of the members of the Board," *Cater*, 887 A.2d at 17, ultimately "the system of attorney discipline, including the imposition of sanctions, is the responsibility and duty of this court," *Cleaver–Bascombe II*, 986 A.2d at 1195 (quotation marks omitted), and consequently our review of the Board's sanctions recommendation is *de novo*. *In re Lea*, 969 A.2d 881, 889 (D.C.2009) (citing *In re De Maio*, 893 A.2d 583, 585 (D.C. 2006)); *see also Cater*, 887 A.2d at 12 ("Whether the Board's determinations are characterized as findings of ultimate fact or conclusions of law, we owe them no deference; our review is *de novo*.").

## III. Disciplinary Action

### A. Length of Suspension

■ Turning to the sanction, we first address the length of suspension. Citing the extent of respondent's violations and the need to "protect the public, the courts and the legal profession," the Board recommended that respondent be suspended for two years. Neither Bar Counsel nor respondent excepted to the Board's recommended suspension, and during oral argument counsel for respondent further indicated acceptance. We therefore give "heightened deference" to the suspension recommendation, *In re Evans*, 902 A.2d 56, 58 (D.C.2006) (citing D.C. Bar R. XI, § 9(g)(2)); *In re Hitselberger*, 761 A.2d 27 (D.C.2000); *In re Delaney*, 697 A.2d 1212, 1214 (D.C.1997), and accept it. On the facts of this case, a two-year suspension is within the range of acceptable outcomes and is not unwarranted. *See, e.g., In re Fair*, 780 A.2d 1106, 1115–16 (D.C.2001) (imposing fourteen-month suspension on attorney who negligently misappropriated funds and exhibited a pattern of neglect in the administration of an estate); *In re Sheehy*, 454 A.2d 1360 (D.C.1983) (imposing two-year suspension on attorney who

neglected a client matter and made misrepresentations to Bar Counsel and the client); *In re Haupt*, 422 A.2d 768, 769–70 (D.C.1980) (imposing three-year suspension on attorney with a prior disciplinary record who neglected a client matter, deceived his client about the status of that matter, and was dishonest with Bar Counsel).

## B. Conditions of Reinstatement

■ Our determination that respondent must be suspended from the practice of law for two years does not end the matter. As we explained in *Cater*, a fixed period of suspension sometimes "may not be enough by itself to protect the public, the courts and the integrity of the legal profession." 887 A.2d at 23. Concluding that this was such a case, the Board recommended that, in addition to imposing a two-year suspension, we also should order respondent to cooperate with a practice monitor who would, prior to respondent's reinstatement, confirm in a written report to the Board that respondent's practices related to the handling of entrusted funds were not "substantially deficient." We appreciate how the Board arrived at this conclusion. *Cater*, after all, explicitly encouraged the Board to "explore[ ]" the use of a practice monitor as a "[r]easonable alternative[ ]" to a fitness requirement "in some cases." 887 A.2d at 23 n. 27. In the end, however, although we "respect ... the considered judgment of the members of the Board," *Cater*, 887 A.2d at 17, and understand why it recommended that a practice monitor be used, exercising *de novo* review, *Lea*, 969 A.2d at 889, we conclude that the use of a practice monitor is not an appropriate sanction in this case.

We have used practice monitors "to help respondents remedy specific practice deficiencies that were at the root of their disciplinary violations." *In re Edwards*, 870 A.2d 90, 98 (D.C.2005) (*Edwards II* ). For instance, in *Edwards II*, the attorney was "confused" about how properly to handle client funds and keep records, and we therefore concluded that a practice monitor was the proper means of "ensur[ing] that respondent operates her escrow account and handles entrusted funds correctly." *Id.* at 98. We cautioned, however, that our disposition was not intended to "suggest that practice monitoring is appropriate for every case, or that it is always a suitable alternative to a fitness requirement." *Id.*

In this case, respondent's violations go well beyond the "specific practice deficiencies" that justified the use of a practice monitor in *Edwards II*, 870 A.2d at 98. As the Board found in its thorough Report (in findings that respondent does not challenge in this court), respondent's conduct involved "more than a negligent misappropriation with related violations." Most importantly, respondent violated Rules 8.1(a), 8.4(c), and 8.4(d) by misleading Bar Counsel during its investigation of the Green matter. These latter violations in particular are not the sort of practice lapses that we have used monitors to address. We thus disagree with the Board that respondent's "fundamental problem" is similar to that of the attorney in *Edwards II, i.e.*, the need for "oversight" to ensure proper record keeping and handling of entrusted funds. *Id.*

Indeed, our review of the case law reveals that the violations at issue in this case are unlike the violations in any case where we have used practice monitors. *See, e.g., In re Baron*, 808 A.2d 497 (D.C. 2002) (per curiam) (ordering practice monitor supervision for attorney who failed to communicate with client during pendency of his appeal and ignored court's requests to contact the client); *In re Vohra*, 762 A.2d 544 (D.C.2000) (per curiam) (ordering

practice monitor to supervise attorney's professional conduct and other conditions relating to the attorney's mental health issues); *In re Pullings,* 724 A.2d 600 (D.C. 1999) (per curiam) (ordering one-year probation with supervision by a practice monitor for failure to properly represent a client). These examples of the typical use of practice monitors further show that using one here would be "unwarranted," D.C. Bar R. XI, § 9(h), and we therefore decline to impose that sanction.

■ Although we have concluded that a practice monitor is not appropriate in this case, we agree with the Board that a two-year suspension alone is not sufficient to address respondent's misconduct. We turn, therefore, to the "fitness requirement"—the "chief" means at our "disposal" when the period of suspension is not "enough by itself to protect the public, the courts and the integrity of the legal profession." *Cater,* 887 A.2d at 23.

■ D.C. Bar R. XI, § 3(a)(2)—the Rule that provides for what has come to be known as the "fitness requirement"— states that an "order of suspension may include a requirement that the attorney furnish proof of rehabilitation as a condition for reinstatement." As *Cater* explained, a fitness requirement "is intended to be an appropriate response to serious concerns about whether the attorney will act ethically and competently in the future, after the period of suspension has run." 887 A.2d at 22. (To be clear, a fitness requirement, like all sanctions, is intended "not to punish the attorney," but rather "to protect the public and the courts, safeguard the integrity of the profession, and

deter respondent and other attorneys from engaging in similar misconduct." *Id.* at 17.) To justify a fitness requirement, "the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *Cater,* 887 A.2d at 24. "In most cases, it is the attorney's misconduct … that casts the requisite serious doubt on the attorney's fitness." *Id.* at 24–25. Yet even if the misconduct "is not grave enough by itself to evoke such doubt," other "aggravating facts [may] justify enhancing the sanction of suspension with a fitness requirement," so long as those aggravating facts are proven by clear and convincing evidence. *Id.* at 25. In determining whether there is a serious doubt as to an attorney's fitness, we have looked to the following five factors:

(1) the nature and circumstances of the misconduct for which the attorney was disciplined;

(2) whether the attorney recognizes the seriousness of the misconduct;

(3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones;

(4) the attorney's present character; and

(5) the attorney's present qualifications and competence to practice law.

*Cater,* 887 A.2d at 21 (citing *In re Roundtree,* 503 A.2d 1215, 1217 (D.C.1985)). Because Bar Counsel presented only sparse evidence about factors three through five, we, like the Board, focus our analysis on the first two *Roundtree* factors.[7]

---

7. Although we ultimately disagree with the Board with respect to the fitness requirement question, we appreciate that the *Roundtree* test, like all multifactor tests, does not admit of easy or always predictable application. *See Menard, Inc. v. Comm'r of Internal Revenue,* 560 F.3d 620, 622–23 (7th Cir.2009) ("Multifactor tests with no weight assigned to any factor are bad enough from the standpoint of providing an objective basis for a judicial decision; multifactor tests when none of the factors is concrete are worse."); *Gulf States*

As for the first factor, we are struck by the "circumstances" of the numerous violations that respondent committed. *Cater,* 887 A.2d at 26. In fact, the Board itself took note of most of these circumstances in its report, but appears to have found them relevant in its determination of the length of suspension only, not in its analysis whether a fitness requirement was appropriate. For instance, as the Board found, respondent not only failed promptly to notify and pay Mr. Green's service providers upon receipt of the settlement funds, but also "distribut[ed] the money needed to pay those providers to his client." What is more, respondent paid "no attention to inquiries from the providers for more than four years before ascertaining that his client had not kept an agreement to pay them." And adding final insult to injury, during those four-plus years, respondent and Mr. Green benefitted from the funds that rightfully belonged to the providers by using those funds to pay down a loan that respondent had made to Mr. Green and his wife. Indeed, if respondent had been charged with misappropriation of funds in the Green matter, as well as in the Obeng matter, there would have been a strong argument that respondent was subject to disbarment for recklessly misappropriating client funds. *See In re Addams,* 579 A.2d 190, 191 (D.C.1990) (en banc).

Respondent's prior discipline before this court, *see In re Boykins,* 748 A.2d 413 (D.C.2000) (*Boykins I*) (per curiam), further counsels in favor of a fitness requirement in this case. *See In re Bettis,* 855 A.2d 282, 288 (D.C.2004) ("It has long been the practice in this jurisdiction to consider an attorney's disciplinary record in deter-mining an appropriate sanction.") (quotation marks omitted); *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc) ("prior disciplinary record is a factor which may be considered in aggravation"); *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc) ("the previous record of the attorney" is an "important factor" in determining the appropriate discipline for attorney misconduct). In *Boykins I* we suspended respondent for 30 days for "improperly receiv[ing] funds for legal services" and for "fail[ing] to advise his client regarding the fee she was entitled to." 748 A.2d at 414. Yet just two months after the Hearing Committee issued its report in *Boykins I,* respondent mishandled Ms. Obeng's and Mr. Green's settlement funds. Respondent's repeated misconduct causes us to have "serious concerns about whether [respondent] will act ethically and competently in the future, after the period of suspension has run." *Cater,* 887 A.2d at 22.

Making things worse still, respondent's dishonesty in response to Bar Counsel's inquiries came just slightly more than a year after respondent completed the probation and a CLE course in professional responsibility that we imposed as part of the sanction in *Boykins I.* As in *Cater,* therefore, respondent's conduct "evince[s] indifference (or worse) toward the disciplinary procedures by which the Bar regulates itself," which means that "a requirement that [respondent] prove fitness to resume practice is entirely reasonable." 887 A.2d at 25 (quotation marks omitted); *see also, e.g., In re Lea,* 969 A.2d 881 (D.C.2009) (imposing a fitness requirement and a 30–day suspension upon attorney who repeatedly failed to respond to Bar

---

*Utilities Co. v. FERC,* 922 F.2d 873, 876 (D.C.Cir.1991) ("To be sure, multifactor tests are subject to manipulation. They often serve more to obscure a tribunal's reasoning than to illuminate it, and thereby do not always cabin a tribunal's future discretion."). Indeed, the most that *Cater* itself had to say for the five *Roundtree* factors was that they were "useful," not outcome-determinative or even indispensable. 887 A.2d at 25.

Counsel's inquiries, avoided service of process, and disregarded the disciplinary process by failing to attend her hearing in person); *In re Slaughter*, 929 A.2d 433 (D.C.2007) (imposing fitness requirement along with three-year suspension upon attorney who engaged in protracted dishonesty and forgery); *In re Ukwu*, 926 A.2d 1106 (D.C.2007) (imposing fitness requirement and a two-year suspension upon attorney who engaged in dishonest conduct in the representation of five clients and neglected the interests of one client). To be clear, we recognize that *Cater* concerned an attorney who failed to cooperate outright with Bar Counsel's investigation, *see id.*, but it cannot be that an attorney who affirmatively misleads Bar Counsel during an investigation is less deserving of a fitness requirement than an attorney who does not respond at all to Bar Counsel.

Turning to the second *Roundtree* factor, we recognize that the Board found that respondent was "contrite," "serious[ ]," and "forthright" during his testimony before the Hearing Committee. We are in no position to and do not question these findings. We conclude, however, that on the facts of this case, the seriousness of respondent's misconduct, combined with his prior disciplinary record, creates "serious doubt" regarding respondent's fitness notwithstanding his contrition. *Cater*, 887 A.2d at 25. *See, e.g., In re Lewis*, 689 A.2d 561, 567 (D.C.1997) (per curiam) (appending Board Report) (imposing fitness requirement in spite of attorney's contrition because respondent's depression and stated intention not to practice law in the "foreseeable future" warranted a demonstration of competence prior to resuming practice).

We understand and appreciate the Board's concern that at the time of these proceedings, a fitness requirement had the potential to impose a serious burden on both the disciplinary system and respondent. Thus, when the Board rendered its report, reinstatement proceedings took "approximately eighteen months," but sometimes "appreciably longer," and involved "three distinct proceedings before a Hearing Committee, the Board, and the Court of Appeals." *Cater*, 887 A.2d at 24. In view of these substantial burdens, *see also id.* at 25, the fact that sanctions are not intended to punish attorneys, *id.* at 17, and the fact that the Board recommended a lengthy suspension, the Board was appropriately sensitive to the concern that a fitness requirement would be unwarranted in this case.

Since the Board issued its report in this matter, however, the reinstatement process for suspended and disbarred attorneys has changed. Under the new procedures, if Bar Counsel contests a petition for reinstatement, proceedings will be expedited. In addition, under the new procedures, any Hearing Committee report is submitted to this court directly within 60 days of the hearing, without review by the Board. D.C. Bar R. XI, § 16(d)(2). And if Bar Counsel is satisfied that the respondent meets the standards of reinstatement, the court can consider the petition on the available record without any additional proceedings. D.C. Bar R. XI, § 16(e). These new streamlined proceedings should alleviate the concerns that the Board had regarding the burdens of the fitness requirement in respondent's case.

## IV. Conclusion

For the foregoing reasons, respondent James R. Boykins is hereby suspended from the practice of law in the District of Columbia for a period of two years. To

gain reinstatement, respondent must demonstrate that he is fit to resume the practice of law pursuant to D.C. Bar R. XI, § 16. The period of suspension shall run, for purposes of reinstatement, from the date that respondent files the affidavit required by D.C. Bar R. XI, § 14(g).

*So ordered.*