**In the Matter of Donald J. SHEEHY, A Member of the Bar of the District of Columbia Court of Appeals.**

**No. M–59–80.**

District of Columbia Court of Appeals.

Jan. 7, 1983.

No appearance was entered on behalf of respondent Sheehy.

Fred Grabowsky, Bar Counsel, Washington, D.C., filed the Report and Recommendation of the Bd. on Professional Responsibility.

Before NEWMAN, Chief Judge, KELLY, KERN, NEBEKER, MACK, FERREN, PRYOR, BELSON and TERRY, Associate Judges.

KERN, Associate Judge:

D.C.App.Bar R. XI, § 7(3) provides in pertinent part:

[T]he Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted.

■ That the respondent attorney here engaged in professional misconduct is not in dispute and hence there is no challenge to factual findings by the Board on Professional Responsibility. We accept the Board's findings of fact as being supported by substantial evidence of record and incorporate herein as an Appendix those findings. We conclude, however, that the Board's recommended disposition of disbarment is unwarranted on the facts of the case. We conclude that a suspension for two years is the appropriate sanction. We deem suspension rather than disbarment as being more consistent with other dispositions in disciplinary cases involving comparable conduct and as otherwise warranted under the circumstances.

Respondent's professional misconduct consisted of neglecting the legal matter entrusted to him by his client in violation of DR 6–101(A)(3) and making serious misrepresentations to both his client and Bar Counsel in violation of DR 1–102(A)(4) and (5). The Board, noting respondent's prior record of a private reprimand for neglecting a client and misrepresenting to that client the status of his matter and of an informal admonition from Bar Counsel for neglecting to investigate and pursue a traffic accident claim, concluded that "respondent has shown ... he ... will not apply the standards of ethical conduct and of

fiduciary responsibility that are *sine qua non* to public confidence in the legal profession."

The Board relies heavily on two unreported decisions, *i.e., In re Duesterdick* (D–9–75) Order of Disbarment dated August 15, 1975, and *In re Spencer* (D–36–80) Order of Disbarment dated February 13, 1980.[1] *In re Spencer* was based upon the reciprocal discipline rule and, hence, this court did not independently review findings and the disposition in that matter. *In re Duesterdick* dealt with an attorney who not only allowed the Statute of Limitations to run in a negligence case he was handling but also falsely testified before an Inquiry Committee.

■ As we have said before there are no easy equations in these matters. While we strive to observe the mandate of Rule XI § 7(3) to achieve consistency in the disposition of disciplinary cases, each case must be decided on its own particular facts. *In re Knox*, D.C.App., 441 A.2d 265 (1982), quoting *In re Russell*, D.C.App., 424 A.2d 1087, 1088 (1980).

The reported disciplinary case that seems most closely on point is *In re Fogel*, D.C. App., 422 A.2d 966 (1980). In that case, respondent neglected an appeal and then lied to his client, the Hearing Committee and the court. Fogel also had a record of prior discipline. He was suspended for one year and a day.

In *In re Russell, supra,* we suspended the respondent for six months after he neglected a personal injury suit for three years, failed to return his client's file, and failed to cooperate with Bar Counsel.

In *In re Smith*, D.C.App., 403 A.2d 296 (1979), we suspended the respondent for eighteen months for neglect of two civil matters and for misrepresentation to his clients concerning the cases. He had no prior discipline.

In *In re Haupt*, D.C.App., 422 A.2d 768 (1980), respondent was suspended for three years for two instances of misconduct: (1)

1. Notice of the Board's reliance on these unreported decisions was given respondent by Bar Counsel before final action was taken by the Board.

neglect and misrepresentation in a divorce proceeding, and (2) misrepresentation in telling a Maryland sheriff that the defendant's fiancee was his assistant so that she could enter the cellblock. Haupt had been previously suspended for 30 days and received a formal admonition.

In *In re Willcher,* D.C.App., 404 A.2d 185 (1979), respondent was suspended for five years for conduct involving twelve separate matters including serious neglect.

In reaching our conclusion that respondent be suspended for two years is more appropriate, we also note the various factors taken into account by the Committee: that respondent "did fully disclose all the pertinent facts in this matter after receiving the follow-up letter from [Bar Counsel]" and respondent's client did receive an amount of money representing an estimate of what she might have received on her accident claim.

We are satisfied that suspension for two years is proper under our Rule.

Accordingly, it is ORDERED that Respondent, Donald J. Sheehy, be and he hereby is, suspended from the practice of law for two years, effective 30 days from entry of this opinion.

*So ordered.*

## APPENDIX

## BOARD ON PROFESSIONAL RESPONSIBILITY DISTRICT OF COLUMBIA COURT OF APPEALS

Bar Docket Number: 507–78

In The Matter of Donald J. Sheehy

## REPORT AND RECOMMENDATION OF BOARD ON PROFESSIONAL RESPONSIBILITY

The respondent attorney has admitted serious neglect and incompetent handling of a legal matter entrusted to him in violation of DR 6–101(A)(3). He has also admitted making written statements both to his client and to Bar Counsel which involved serious misrepresentations and deceit, in violation of DR 1–102(A)(4) and (5). The only real issue before this Board is the

scope of the sanction which we are called upon to recommend to the Court.

All of the essential facts in these proceedings are found in a written stipulation between the parties, court records, and letters written by the respondent. While there are some variances between the verbal testimony given by the complaining witness and that given by respondent they do not affect the crucial admissions which are found in the documents referred to.

We turn now to a recital of the significant events. On March 8, 1974, Ms. Beverly A. Telfaire was involved in a minor automobile accident in the District of Columbia. The driver of the other vehicle was one Raymond Chavis; the owner was Darling Delaware Co., Inc. Ms. Telfaire was treated by her physician, Dr. Thomas Dent, for back injuries and she claims that she missed at least twelve days of work.

Shortly afterwards, Ms. Telfaire called the respondent to discuss the accident. Respondent told her that he would send her an authorization form and retainer agreement and he claims he did so. There is confusion in the testimony as to whether Ms. Telfaire received the retainer agreement and, if so, whether she mailed it back to the respondent. He testified he did not receive it, but both parties agree nevertheless that an attorney/client relationship was established in 1974. There was some shifting of addresses on the part of both parties during the next year. Claiming that she was unable to reach respondent by telephone, Ms. Telfaire on March 8, 1976, filed a complaint with Bar Counsel which was formally docketed. Bar Counsel thereupon found a new address for respondent and advised him of Ms. Telfaire's complaint, and on April 7 Ms. Telfaire met with respondent in his office and executed another retainer agreement and an authorization form permitting respondent to get information from Ms. Telfaire's doctor. At respondent's urging she then asked Bar Counsel to terminate his investigation stating that she and respondent had reached an understanding.

The problems with communications between Ms. Telfaire and respondent contin-

ued. In a January 26, 1977, letter, however, respondent stated to Ms. Telfaire that "[a]t the present time I am trying to move Mr. Dent toward a settlement so we can avoid filing suit."[1] This was, of necessity, a misrepresentation as Mr. Dent was in fact Dr. Dent, the physician who treated Ms. Telfaire and not a proper party defendant.

On March 7, 1977, one day before the statute of limitations on Ms. Telfaire's claim would expire, the respondent filed a personal injury and property damage action on her behalf in Superior Court, naming Thomas M. Dent as the sole defendant, and alleging that he was the driver of the vehicle that struck Ms. Telfaire. On the same day respondent obtained a summons to be served on Thomas M. Dent. Respondent throughout this period was fully aware that Thomas M. Dent was Ms. Telfaire's doctor and *not* the driver of the automobile, and the police accident report which was readily available showed the owner of the other automobile involved to be the Darling Delaware Co., Inc. and the driver to be Raymond Chavis.

When respondent filed his complaint, he hand-lettered "and John Doe" next to the typed name of the defendant in the caption of the pleading. This hand lettering apparently was written after the complaint had been accepted for filing, for it does not appear on the caption of the court jacket.

One month after the complaint was filed, on April 7, 1977, Judge Johnson granted an oral motion of the respondent for leave to file an amended complaint naming the proper parties defendants, i.e., Raymond Chavis and Darling Delaware Co., Inc. Respondent says he gave copies to employees of Alarm Masters Security Systems, Inc. (which company was also a client of respondent) for service on the defendants. No service was effected, and the respondent had a falling out with Alarm Masters Security Systems, Inc. (on another matter) and apparently forgot all about pursuing Ms. Telfaire's claim.

In October, 1978 respondent was offered a position with the District of Columbia government as Deputy Chief of the Office of Judicial Affairs to draft legislative and legal opinions and to act as liaison to the offices of the Corporation Counsel and the U.S. Attorney. He accepted the position and began to wind up his private law practice.

Ms. Telfaire again had problems getting in touch with respondent, and on February 26, 1979, almost two years after the statute of limitations on her claim had expired she filed a second complaint against respondent. With it she incorporated a copy of the amended complaint, a copy of the letter from respondent to her dated January 26, 1977, (which has been previously referred to) in which respondent falsely mentioned his alleged settlement negotiation with "Mr. Dent," and a letter which Ms. Telfaire had mailed to respondent under date of January 9, 1979, but which had been returned undelivered.

Upon receiving Ms. Telfaire's new complaint, Deputy Bar Counsel, Edwin Yourman, obtained respondent's current office address and telephone number and called on February 27 and 28, and March 1, 2 and 5, 1979, leaving messages asking respondent to return his call. These messages spurred respondent to seek an immediate accommodation with Ms. Telfaire by means of deceit. On March 1 he sent a letter to Ms. Telfaire in which he made the following statement:

> "Please be advised that I now have a settlement offer of $1,200 in cash. I would recommend acceptance for the various reasons I have previously discussed."[2]

Ms. Telfaire agreed in a telephone conversation with respondent to accept the $1,200 "offer." Several weeks later, since she had not yet received her money, Ms. Telfaire again called the respondent. During this conversation respondent said "as soon as the people would send him the money, that he would send it to [her]".[3]

1. Bar Exhibit 9a.

2. Stipulation, para. 15; Bar Exhibit 18.

3. Transcript, pp. 14–15.

As a matter of fact respondent had received no offer for settlement from anyone. The case against Mr. Chavis and Darling Delaware Co., Inc. had not gone forward and was barred by the statute of limitations. Respondent was attempting to grossly deceive his client as to the true status of affairs.

Communications between Ms. Telfaire and respondent again lapsed until May 21, 1979, when respondent told Ms. Telfaire that he would mail her a check for $760.00 that day. The figure was arrived at by respondent stating that after he deducted his one-third fee of $400.00 and "costs" of $40.00 that $760.00 would be the balance due Ms. Telfaire under the purported settlement. Respondent received a tax refund which was the actual source of the funds for the $760.00 check to Ms. Telfaire which she did receive in due course and which was drawn on an account labeled "Donald J. Sheehy, Attorney At Law."

At no time did respondent ever disclose to Ms. Telfaire the truth.

In late May or early June of 1979, Ms. Telfaire brought the situation to the attention of the Bar Counsel. She explained her efforts to obtain what she thought were the proceeds of the settlement from respondent, she described his check to her, and pointed out that she had never authorized the respondent to endorse the settlement check.

In a letter dated June 4, 1979, Bar Counsel advised respondent of the pending investigation, and asked him to address several issues concerning the purported settlement. The letter accurately reflected the information available at that time.

After respondent received Bar Counsel's letter he wrote the following reply:

"Dear Mr. Grabowsky:

In response to your inquiry regarding the above, please be advised that on March 1, 1979, I wrote to Miss Telfaire advising her of a settlement offer of $1,200.00, of my change of address, and at the same time suggested that she accept the offer.

Subsequent to my conversation with Mr. Yourman of your office, I spoke with Miss Telfaire and she indicated to me on the phone that the offer of $1,200.00 was acceptable. At the same time she inquired as to the amount she would receive. I advised her of the one-third attorney fee as per the retainer agreement of April 7, 1976, which would be $400.00 and that I had incurred a filing fee cost of $40.00 which funds I advanced (Check # 7292, dated March 7, 1977 made payable to Clerk of Superior Court, D.C.). Any other costs which have been incurred would be waived. Therefore, she would receive $760.00.

After that time I always returned Miss Telfaire's telephone calls within a few days. However, I could not always reach her. Therefore, I would leave a message at either her residence or her place of employment that I had 'returned her call'.

Somewhere in the vicinity of Easter week (April 22, 1979) I talked with Miss Telfaire when returning one of her calls. She stated that she was broke and needed the money badly. I advised her that as of that time I still did not have the money and that I would send her a check just as soon as I received it since I could sympathize with her financial condition.

In the month of May, she called several times and each time I returned her calls either to her home or her place of employment, leaving the message whenever I did not talk with her directly that I was 'returning her call'.

On May 21, 1979 I called Miss Telfaire and advised her that I had received the settlement money. Again we discussed the breakdown of funds and the fact that she would be receiving $760.00. She wanted to know when she would be receiving the money since she needed it and I replied that hopefully I would be putting it in the mail that day or the next so that she would have it for the long Memorial Day weekend which was coming up. I mailed a check to her dated May 23, 1979 in the amount of $760.00 drawn on the account of Donald Joseph Sheehy—Attorney at Law together with

a handwritten account, so that she would have the money for the Memorial Day weekend. Miss Telfaire never gave me a power of attorney to endorse her name, however, all our discussions were about 'send me the money because I need it'.

At no time was there any questioning or disagreement about the amount of money received, the division of funds or the amount of money to be sent Miss Telfaire. Frankly I was most anxious to close Miss Telfaire's case and get her $760.00 for the long weekend coming up, particularly because of her conversation regarding her financial need.

Very truly yours,
[Signed] Donald Joseph Sheehy" [4]

Upon receipt of the above letter Mr. Yourman wrote respondent again, repeating his previous request for details regarding the alleged settlement and the disbursement of funds. Soon afterwards respondent sought a conference with Mr. Yourman at which he confessed to his acts of neglect and attempt at deception heretofore described. He supplemented this with a detailed letter to Bar Counsel which was introduced as evidence before the Hearing Committee.[5]

The Board concurs fully in the Hearing Committee's own summary of respondent's violations of the Code of Professional Responsibility.

"Mr. Sheehy has violated DR 6–101(A)(2) and (3). His neglect of, and failure to prepare Ms. Telfaire's suit is clear. It is undisputed that as of Ms. Telfaire's telephone call in 1974, the attorney-client relationship was established. Nonetheless, in the course of his representation, he filed suit against the wrong defendant, amended suit after the statute of limitation had expired and failed to serve the correct defendants. As a result of his inattention, negligence and neglect, Ms. Telfaire's cause of action lapsed.

Mr. Sheehy also violated DR 1–102(A)(4) by engaging in conduct involving dishonesty, deceit and misrepresenta-

tion. At all times up until the commencement of these proceedings, Mr. Sheehy maintained the deception to Ms. Telfaire that her case had been actively pursued, and that he had obtained from the defendants a legitimate settlement offer. In fact, Mr. Sheehy was aware that he had done little to pursue the case and his negligence and neglect had resulted in the expiration of the statute of limitations. His so-called 'settlement' was a disguised payment designed to finish the matter and placate Ms. Telfaire. Such deceit strikes to the heart of the relationship between attorney and client, and is a clear violation of the Code.

Mr. Sheehy's acts of deception were compounded when he responded to the first letter from Bar Counsel. Realizing that this conduct was under examination, he made an intentional and calculated attempt to mislead Bar Counsel. That conduct, in and of itself, establishes a violation of DR 1–102(A)(4)."

TERRY, Associate Judge, concurring:

I agree generally with much of what Judge Ferren says in his dissent, and, like him, I would be prepared to vote for disbarment or a longer suspension than two years in a comparable case in the future, after due notice to the members of the bar of a tightening of disciplinary standards. In this case, however, I have voted for a two-year suspension for three reasons.

First, although respondent's conduct has been unconscionable, disbarment is clearly not warranted on the facts of this case, in light of our evolving body of case law. Second, although comparing one case with another is always an inexact process, I believe that this case falls somewhere between In re Haupt, 422 A.2d 768 (D.C.App. 1980), in which we adopted the recommendation of the Board on Professional Responsibility for a three-year suspension, and In re Fogel, 422 A.2d 966 (D.C.App.1980), in which we imposed a year-and-a-day suspension, again adopting the Board's recommen-

4. Bar Exhibit 14; Transcript, pp. 65–70.

5. Bar Exhibit 17.

dation. Although we must always give due deference to the recommendations of the Board, we must also decide where each case fits on the disciplinary spectrum. In my judgment the relative severity of respondent's misconduct, compared with that of other respondents, places this case at or near the two-year mark, between *Haupt* and *Fogel.*

Third, and most importantly, to me there is little practical difference between a two-year and a three-year suspension, especially in this case. Under Rule XI, § 21 of our Rules Governing the Bar, an attorney suspended for more than one year may be reinstated only on petition. Since reinstatement is not automatic (as it is for one suspended for a year or less), and since respondent's failure to appear in this court suggests, at the very least, that he is unconcerned about his standing in the legal profession, I think it is highly unlikely that he will seek to return to the practice of law after two years, after three years, or at any time in the foreseeable future. Thus whether he is suspended for two years or three is not a matter of great consequence.

One additional matter merits comment. I cannot accept the view of my other dissenting colleagues who would treat this case as equivalent to a disbarment by consent. Respondent's failure to appear in this court is certainly a factor for us to consider in deciding what sanctions to impose, but in my view it is not sufficient in itself to justify disbarment. Respondent's inaction does not relieve us of our independent duty to weigh all the facts before reaching a decision. In this regard I agree completely with footnote 1 of Judge Ferren's opinion.

NEWMAN, Chief Judge, with whom KELLY and PRYOR, Associate Judges, join, dissenting:

The Board on Professional Responsibility, for overwhelming good cause, recommended the disbarment of respondent. Respondent

never appeared in this court by counsel or otherwise to challenge the report or recommendation of the Board on Professional Responsibility. I am satisfied that the recommendation of the Board was appropriate. I respectfully submit that we disserve the public by rejecting the recommendation in this case, to which not even the respondent objected.

FERREN, Associate Judge, dissenting:

In suspending respondent for two years, the majority treats the matter too lightly. In recommending disbarment, however, the Board on Professional Responsibility "would foster a tendency toward inconsistent dispositions for comparable conduct." D.C.App.R. XI, § 7(3).[1] For the reasons that follow, I would suspend respondent from the practice of law for at least three years.

### I.

I begin with the proposition that our standard of review in Rule XI, § 7(3), *ante* at 1361, calls for substantial deference to the Board:

> [T]he rule endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise. The rule requires that we enforce a general sense of equality in the sanctions handed out, but it otherwise commands that we should respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable. [*In re Haupt,* D.C.App., 422 A.2d 768, 771 (1980) (per curiam) (*Haupt I*).]

Thus, while dispositions must not be inconsistent, we have adopted a rough approximation standard, giving due weight to the Board's expertise and, of considerable significance, to the Board's opportunity to ob-

---

1. I cannot agree with my other colleagues in dissent who would treat this matter, in effect, as a disbarment by consent. The fact is, respondent did not consent, *see* D.C.App.R. XI, § 17; he put the Board to its proof. There are many reasons why an attorney may choose not to appear to defend in this court. Failure to appear, therefore, should not be deemed, automatically, to imply indifference let alone consent to whatever happens.

serve demeanor. Such deference is especially important for cases in which the Board confronts an attorney with a prior disciplinary record and thus is likely to have a special sense of the most appropriate sanction the second or third time around.

I stress our deferential standard of review because, in *In re Fogel*, D.C.App., 422 A.2d 966 (1980) (per curiam), which the majority emphasizes, we deferred to the Board's recommendation of a year-and-a-day suspension even though, when compared with other cases, we might well have imposed a greater discipline. Our standard of review, therefore, likewise implies that when we receive such a strong recommendation as we have here—disbarment—we have a substantial burden to justify our own imposition of a lesser sanction, especially one as low as two years. *See In re Whitlock*, D.C.App., 441 A.2d 989, 991–92 (1982) (per curiam) (in two cases, Board's aggregate recommendation of one-year suspension reduced to six months).

Consistent with the required deference, I agree with my colleagues in the majority that disbarment is unwarranted here. Aside from two unreported disbarment orders—one in 1975[2] when our disciplinary system was relatively new and the other in 1980[3] based on reciprocal discipline—we have not ordered disbarment for the level of noncriminal misconduct found in this case. Precedent indicates that to avoid inconsistency with the pattern of previous dispositions, even roughly defined, the Board should have recommended a sanction less than disbarment. By imposing a suspension of only two years, however, the majority of this court overreacts. The court is too lenient.

## II.

*In re Fogel, supra,* the year-and-a-day suspension case that the majority calls "most closely on point," *ante* at 1361, is a single-incident, neglect-of-appeal case in which the respondent attorney made certain misrepresentations to his client, the court,

and the Hearing Committee. The respondent, moreover, had received a previous reprimand, as well as unexplained discipline in Virginia. *Id.* 422 A.2d at 967. The present case also is a single-incident neglect case; it arises out of a plaintiff's personal injury action in which respondent misrepresented the situation to his client and to Bar Counsel. Like Fogel, respondent Sheehy has been subject to previous discipline: a reprimand (for neglect and misrepresentation) and an informal admonition (for neglect).

The similarity stops there, however, for the present case is more egregious than *Fogel* in three significant respects: First, respondent Sheehy's neglect resulted in the loss of his client's opportunity to litigate, for he permitted the statute of limitations to expire. In contrast, Fogel was replaced by other court-appointed counsel, without prejudice to the client's opportunity to pursue his appeal (which he ultimately lost). *Id.* at 967 n. 1. Second, while Fogel fabricated excuses for failures to appear in court, respondent Sheehy fabricated a complete coverup directed at his client and Bar Counsel, replete with purported negotiations, settlement, and use of respondent's own funds as supposed payment from the opposing party. Finally, unlike Fogel, respondent harassed an innocent third person, initially suing his client's doctor (in a last minute effort to toll the running of the statute of limitations) when respondent "was fully aware" that the doctor was not the driver of the automobile. *Ante* at 1363. In sum, the severity of the deception, the prejudice to the client, and the exploitation of an innocent third person comprise substantially greater misconduct here than that found in *Fogel, supra.*

Another case, reflecting a disposition closer to the one ordered by the majority, is *In re Smith*, D.C.App., 403 A.2d 296 (1979), in which we adopted the Board's recommendation of an 18-month suspension coupled with an order to make restitution of $280.

---

**2.** *In re Duesterdick,* D.C.App. (No. D–9–75, Aug. 15, 1975).

**3.** *In re Spencer,* D.C.App., (No. M–30–78/D–36–80, Feb. 13, 1980).

There, the respondent neglected a case in which he had agreed to investigate whether the client's deceased father had left any assets. He accepted a retainer, knowing after preliminary investigation that the father's assets were insufficient to warrant proceeding further. The respondent also abandoned a landlord-tenant case, resulting in a default judgment against his client and her eventual eviction. Although *Smith* concerned two cases of misrepresentation/neglect and abandonment, respectively, respondent Sheehy's conduct here is altogether more egregious, given his misrepresentations both to his client and to Bar Counsel, the severe prejudice to this client, his harassment of an innocent doctor, and his record of previous discipline.

As I see it, the most useful case for our purposes here is *Haupt I, supra,* where this court adopted the Board's recommendation of a three-year suspension for two counts of misconduct. First, counsel intentionally failed to pursue a divorce for his client while twice obtaining the fee for publication, deceiving his client by saying he "would have her divorce by Christmas," *id.* 422 A.2d at 770, and falsely representing to Bar Counsel that "he had not received money for publication and that the divorce complaint had been reinstated." *Id.* Second, counsel misrepresented to a Maryland sheriff that the fianceé of an incarcerated juvenile client was actually counsel's assistant, as a ruse to obtain permission for her entry to the cellblock. *Id.* This pattern of misconduct was compounded by 30- and 90-day suspensions in Maryland and a 30-day suspension and informal admonition in the District of Columbia. *Id.* at 771 n. 2.

Respondent Sheehy not only is responsible for misrepresentations at least as serious as those in *Haupt I, supra,* but also more seriously has prejudiced his client (through the running of the statute of limitations) as well as an innocent third party (the client's doctor whom respondent knowingly sued without a legitimate basis).

These latter factors, coupled with the Board's clear sense that the heaviest possible sanction is called for here, combine to offset the fact that respondent's prior disciplinary record does not appear to be as serious as Haupt's three previous suspensions.

Were it not for this court's (and the Board's) more recent cases, our decision in *In re Duesterdick,* D.C.App., (No. D–9–75, Aug. 15, 1975) (unreported disbarment) probably would be controlling; for, as the Board noted, Duesterdick—in a case very similar to this one—was disbarred for permitting the statute of limitations to run on his client's personal injury claim and for falsely stating both to his client and to an Inquiry Committee of the Board that the claim had been settled. However, the newer disciplinary perspective supplied by the dispositions summarized above and in the majority opinion, *ante* at 1361–1362, when compared with our latest disbarments for noncriminal conduct, reveals that the most severe sanction typically has been reserved for a more extreme pattern of ethical violations than we have here. *See, e.g., In re Haupt,* D.C.App., 444 A.2d 317 (1982) (en banc) (per curiam) (*Haupt II*) (disbarment for "pattern of neglect and wilfull disregard of ethical and legal duties" concerning twelve clients); *In re Burka,* D.C. App., 423 A.2d 181 (1980) (en banc) (disbarment for two-year pattern of conservator's dishonest and deceitful use of ward's assets); *cf. In re Willcher,* D.C.App., 404 A.2d 185 (1979) (five-year suspension for neglect of ten matters, excessive fees, and failure to cooperate with Bar Counsel, mitigated by a debilitated mental condition).[4] Respondent's major misconduct here, coupled with his similar, though perhaps lesser lapses in the past, does not rise to the pattern of noncriminal misconduct typically required for disbarment.

Accordingly, with a view to consistency rather than a tilt toward a general lowering

---

4. A five-year suspension is virtually equivalent to disbarment, for unless convicted of a crime involving moral turpitude, *In re Kerr,* D.C.App., 424 A.2d 94 (1980) (en banc), a disbarred lawyer may petition for reinstatement after the "expiration of at least five years from the effective date of the disbarment." D.C.App.R. XI, § 21(2).

of disciplinary standards, I believe this court should order no less than a three-year suspension of respondent Sheehy.

### III.

In focusing on the policy of consistency with previous dispositions, I recognize that consistency will be ill-advised if applied too rigidly, in a way that forever precludes our raising or lowering the disciplinary floor. If the experience of the Board and this court were to indicate that the progression of disciplinary sanctions, as applied, has been too light or too heavy, we must be able to reset that progression at a higher or lower level. But the Board should recommend it, and we should do it, in a straightforward manner, not incrementally under the guise of purported consistency. I would be open to disbarment on a record such as this if done openly as part of an upward realignment of disciplinary standards.

What I fear is that the majority disposition here will be read as a signal for a general lowering of disciplinary standards, just as the Board's proposed disbarment, if adopted, could be read as an indirect effort to raise standards. Neither reading would be correct, for I understand both the majority of this court and Board to be premising their respective dispositions on consistency with the past. Given *Duesterdick, supra,* the Board and my dissenting colleagues at least have solid authority for what they propose. I perceive in the majority's approach a reliance on cases such as *Fogel, supra,* and *Smith, supra,* to drop the sanction too low. In *Haupt I, supra,* I find strong support for a three-year suspension. Respectfully, therefore, I dissent.