In re Andrew J. KLINE, Respondent.

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 358547).**

**No. 09–BG–1531.**

District of Columbia Court of Appeals.

Argued Nov. 23, 2010.
Decided Jan. 13, 2011.

Jacob A. Stein, with whom George A. Fisher, Washington, DC, was on the brief, for respondent.

H. Clay Smith, III, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, Elizabeth A. Herman, Deputy Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before RUIZ and FISHER, Associate Judges, and FARRELL, Senior Judge.

FARRELL, Senior Judge:

Respondent Kline, in the Hearing Committee's words, "committed a significant number of serious ethical violations" which the Board on Professional Responsibility (the Board) summarized as follows:

Respondent failed to make crucial litigation filings, and as a result, a default judgment was entered against his client, [The Ad Agency, Inc.]. Without telling his client about the default judgment, Respondent negotiated settlement terms with the adverse parties [collectively the Savino defendants] under which his client was to pay $50,000. He did not bring these terms to his client's attention. Instead, he submitted a draft agreement that called for dismissal of his client's $7,500 contract claim, but required no monetary payment from his client. When even those terms were not acceptable to his client, he forged his client's signature on a settlement agreement containing the terms he had negotiated, paid the adverse parties $50,000 of his own funds [1] and presented the forged agreement to them as a valid settlement agreement.

Further, respondent commingled his personal funds with client funds in a trust account, and after he paid the $50,000 to the adverse parties by check from the trust account, the balance dropped to some $4,342.53 less than he was required to maintain for existing clients, resulting in misappropriation of client funds. For detailed reference, we attach to this opinion the findings of fact of the Hearing Committee and the Board.

On this evidence, the Hearing Committee and the Board determined that respondent had violated numerous Rules of Professional Conduct, chiefly 8.4(b) (com-

---

1. Actually, as will be apparent, approximately $4,343 of the $50,000 was client funds, be- longing to clients other than The Ad Agency, Inc.

mitting a criminal act, forgery, that reflected adversely on his fitness as a lawyer), 8.4(c) (conduct involving dishonesty or deceit), 1.15(a) (commingling and negligent misappropriation), and 1.3(b)(2) (intentionally prejudicing or damaging a client during the course of the professional relationship). The Board recommends that respondent be suspended from the practice of law in the District of Columbia for eighteen months, with nine months of the suspension stayed in favor of monitored probation with conditions, and without a requirement that he show fitness to be reinstated.

Respondent does not dispute the recommended sanction, but Bar Counsel argues, in his brief and reply brief, that respondent should be disbarred because (a) contrary to the Board's conclusion, his misappropriation of client funds was reckless, not negligent, see generally In re Addams, 579 A.2d 190 (D.C.1990) (en banc); In re Anderson, 778 A.2d 330 (D.C.2001); and (b) in any case, the aggregate of his dishonest conduct—including the criminal act of forgery—compels that sanction.[2] We do not accept the Board's recommendation of an eighteen-month suspension (much less the halving of it in favor of probation), because in our view that sanction takes inadequate account of the gravity of respondent's misconduct, which included a criminal act, forgery, and multiple though related acts of dishonesty besides misappropriation. Instead, we will suspend respondent for three years in keeping with past sanctions ordered for analogously culpable behavior by an attorney. Like the Board, however, we do not believe that a showing of fitness is necessary before respondent may be reinstated.

## I.

As neither respondent nor Bar Counsel seriously disputes the facts found by the Hearing Committee, and respondent takes no issue with any of the violations determined by the Board, the questions before us relate to the proper sanction. Our framework for consideration of that issue was summarized in In re Bettis, 855 A.2d 282 (D.C.2004):

> This court's Rules Governing the Bar state that the court ... shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted. D.C. Bar Rule XI, § 9(g)(1). Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed. However, "[w]hen the court disagrees with the Board as to the seriousness of the offense ... the Board's recommendations are accordingly granted less weight." In re Kennedy, 542 A.2d 1225, 1228 (D.C.1988) (citing In re Reback, 513 A.2d 226, 230–231 (D.C.1986) (en banc)). "In the final analysis, the responsibility to discipline lawyers is the court's" ... In re Shillaire, 549 A.2d 336, 342 (D.C. 1988); see also, e.g., In re Ryan, 670 A.2d 375, 380 (D.C.1996) ("the ultimate choice of a sanction rests with this court" (citation omitted)). We determine what the appropriate sanction should be by considering "the nature of the violation, aggravating and mitigating circumstances, the absence or presence of prior disciplinary sanctions, the moral fitness of the attorney, and the need to protect the legal profession, the courts, and the public." In re Lenoir, 604 A.2d 14, 15 (D.C.1992).

2. As we point out later, at oral argument Bar Counsel broadened this argument to one that the forgery by itself, as a crime of moral turpitude, requires the disbarment.

*Id.* at 287 (citations and internal quotation marks partly omitted).

## II.

In their briefs, Bar Counsel and respondent first dispute at length whether his misappropriation of client funds was reckless, requiring near-automatic disbarment under *Addams,* 579 A.2d at 191, or instead negligent, as the Board concluded. Bar Counsel makes only a feint at challenging the Hearing Committee's finding that respondent in fact believed that the $50,000 he withdrew from the trust account belonged to him, in the form of earned legal fees he had neglected to remove from the account. Since that finding was based on an assessment of respondent's credibility at the hearing, we accept it, *see In re Micheel,* 610 A.2d 231, 234 (D.C.1992), particularly because all but some $4,343 of the $50,000 was indeed (commingled) funds belonging to respondent.

■ Bar Counsel nonetheless argues that respondent's handling of the trust account exhibited "a conscious indifference to the consequences of his behavior for the security of [unearned] funds," *Anderson,* 778 A.2d at 339, in the first instance because, when the records of the account were destroyed by a crash of his laptop computer in late February or early March of 2005 (a fact found by the Hearing Committee and not disputed), respondent had no back-up record allocating the funds in the account. "As a fiduciary," Bar Counsel maintains, respondent was reckless in "keeping all of his financial records on a laptop computer with no computer back-up or documentation regarding his handling, maintenance and disposition of client funds entrusted with him." But, in our view, though that neglect may be inexcusable—a lapse from the standard of care owed by an attorney keeping records in the computer age—it does not show recklessness by the required proof quantum of clear and convincing evidence. *See Anderson,* 778 A.2d at 339.

■ Bar Counsel's main point, however, focuses on respondent's conduct—or relative inaction—after the computer crash, in the period before he wrote the $50,000 check in mid-July of 2005. Respondent did not hire an accountant to aid in reconstructing his records,[3] but instead only (a) secured help from a data recovery firm, unsuccessfully, to retrieve the information on the computer hard-drive, and (b) set up a new trust account at a different bank, leaving the old account dormant except to pay submitted claims that apprised him of the presence therein of client funds. Respondent, in other words (Bar Counsel's), "was content to wait silently for five months, and if no one made a claim in that time, he decided he would assume the funds remaining in a fiduciary account belonged to him."

Respondent's mere recourse to a new account and the inaction of awaiting claims, if any, to funds in the old one did not justify his ultimate withdrawal of the $50,000, even if he believed that money was his. Yet, as the Board pointed out, nearly all of the withdrawn funds in fact belonged to respondent, and in these circumstances we agree with the Board that his meager remedial measures before treating the funds as his fall on the side of negligence rather than recklessness. Recklessness cannot "be shown by inadequate record-keeping alone combined with commingling and misappropriation." *Anderson,* 778 A.2d at 340. And, the fact that respondent drew on funds nearly all his own to pay a settlement founded on

---

**3.** As Bar Counsel points out, respondent testified that he retained an accountant only later, in 2006 after Bar Counsel sought information about the trust account.

deceit is not, we think, an "aggravating factor[ ]," *id.*, enough to show recklessness by clear and convincing evidence. Rather, it is properly dealt with under Bar Counsel's alternative argument that the entirety of respondent's misconduct, including forgery, dishonesty, *and* misappropriation compels a greater sanction.

### III.

 Although the ordinary sanction for negligent misappropriation would not exceed suspension for six months, *see, e.g., In re Fair,* 780 A.2d 1106, 1115 (D.C.2001); *Anderson,* 778 A.2d at 332, respondent's misconduct went far beyond the unauthorized use of client' funds. His additional undisputed serious misconduct included: dishonesty and deceit toward both his client and an adversary to cover up the neglect of his client's case; the criminal act of forgery; the deliberate failure to communicate with his client about the status and direction of the case; and the deliberate frustration of the client's objective by settling the case, through a false agreement, without the client's permission. The Hearing Committee struggled, as did the Board on review, to recommend a sanction in keeping with what both saw as decisions of this court themselves not marked by "complete consistency" (in the Hearing Committee's words). We do not lightly reject the recommendation of either body for an eighteen-month suspension, and we applaud each for its conscientious effort to distill unifying principles from our cases imposing sanctions for analogous misconduct. Nevertheless, for the reasons that follow, we conclude that an eighteen-month suspension understates the gravity of respondent's misconduct, *see Bettis, supra* (normal rule of deference carries less weight when court disagrees with Board's

evaluation of seriousness of misconduct), and that a suspension of substantially greater duration is necessary to deter such misbehavior. *See Reback,* 513 A.2d at 231 ("The discipline we impose should serve not only to maintain the integrity of the profession and to protect the public and the courts, but also to .deter other attorneys from engaging in similar misconduct.").

 At oral argument to the court, Bar Counsel contended that respondent's commission of forgery, a criminal act involving moral turpitude, *see In re Sluys,* 632 A.2d 734 (D.C.1993), should result in his disbarment without more, at least presumptively in the same way that intentional or reckless misappropriation requires near-mandatory disbarment. *See Addams,* 579 A.2d at 191. For us to consider that argument in this case, however, is inappropriate. The argument was not made to the Board, whose consideration of it would, we believe, be an important predicate to this court's own judgment whether to depart from past decisions that have not treated Rule 8.4(b) violations, even involving crimes of moral turpitude, as meriting near *per se* disbarment.[4] Also, because the point was not briefed to us (raised by Bar Counsel only, as stated, in oral argument and then only in response to court questioning), respondent has had no full and fair opportunity to respond to it. We leave consideration of Bar Counsel's late-blooming contention to another case.

 At the same time, Bar Counsel is correct that the key goals of attorney discipline to protect the public and deter similar misconduct assume special prominence when the misconduct includes a crime involving moral turpitude. We recognized as much, and not for the first time, in *In*

---

4. It is otherwise, of course, when the attorney has been convicted of a crime involving moral turpitude. *See* D.C.Code § 11–2503(a) (2001).

*re Slaughter*, 929 A.2d 433 (D.C.2007), where we suspended an attorney for three years with a fitness requirement for engaging in forgery and dishonesty, but added that we would not have hesitated to disbar him had Bar Counsel requested that sanction. *Id.* at 447 n. 9.[5] Moreover, as in *Slaughter*, respondent's forgery did not take place in isolation; it was part of a scheme of dishonesty entailing falsification of two settlement agreements, aggravated further by misappropriation of client funds that at least approached being reckless. We can agree that, as this course of conduct extended only over a few months, it differed from the "protracted dishonesty" (the "repeated acts of dishonesty ... over a three year period") committed in *Slaughter*. *See* 929 A.2d at 447–48; *see also In re Pennington*, 921 A.2d 135, 141 (D.C.2007) (severest sanctions largely reserved for "misconduct criminal or quasi-criminal in nature that 'reflect[ed] a *continuing and pervasive* indifference to the obligations of honesty in the judicial system' " (emphasis added)). In view of the mitigating circumstances pointed to by the Hearing Committee and the Board,[6] we thus are unwilling to order respondent's disbarment, as Bar Counsel urges us to do. Still, an eighteen-month suspension is incommensurate with the sanctions we have previously imposed for dishonesty aggravated to a degree comparable to respondent's.

In *In re Daniel*, 11 A.3d 291 (D.C.2011), for example, we suspended for three years an attorney who, though he had not committed a criminal act under Rule 8.4(b), used his client trust accounts as personal and business accounts to conceal his own money from the Internal Revenue Service, and relatedly lied to the IRS about his income. In keeping with our past decisions, we repeated that "[t]here is nothing more antithetical to the practice of law than dishonesty, and it cannot be condoned by those charged with protecting the public from unscrupulous conduct by lawyers." *Daniel*, 11 A.3d at 300. We noted further that Daniel had "commingled funds, a serious violation of Rule 1.15(a)," though he "did not misappropriate, the more egregious Rule 1.15(a) violation." *Id.* at 301. Similarly, in *In re Perrin*, 663 A.2d 517 (D.C.1995), we suspended for three years a lawyer who had been involved, "in the course of practicing his legal specialty, in an illegal scheme that resulted in the loss of millions of dollars to innocent investors." *Id.* at 520.[7] We held this to be "conduct involving dishonesty," even as we accepted the Board's determination that Perrin's acts "were [not] deliberate and calculated to deceive." *Id.* at 519, 521.

5. In *Slaughter,* the attorney misrepresented to his law firm that the State of Arkansas had hired him on a contingent fee basis to prosecute an environmental lawsuit; he forged the signature of the Assistant Attorney General of Arkansas on the fee agreement to convince the firm that he had been retained.

6. Both bodies cited, as mitigating circumstances, the facts that: respondent is genuinely remorseful about his actions; the damage to his client, "albeit tangible," did not appear to have been "devastating monetarily or otherwise"; respondent cooperated with Bar Counsel in the investigation; character witnesses expressed the belief that his misconduct was an aberration in an otherwise unblemished 27–year practice as a lawyer; and he has since implemented measures in his practice "to prevent the recurrence of the problems and circumstances leading to this proceeding."

7. Specifically, Perrin admitted having "participated in a scheme to make unreasonable and unwarranted representations in connection with a series of real estate ventures." *In re Slattery,* 767 A.2d 203, 217 (D.C.2001).

Further, in *In re Steele*, 868 A.2d 146 (D.C.2005), we imposed a three-year suspension where the attorney, besides fabricating a subpoena, had neglected clients and misled some as to the status of their cases over several years. And in *In re Sheehy*, 454 A.2d 1360 (D.C.1983) (en banc), we suspended the attorney for two years for neglecting a client's matter, resulting in a judgment against her; for falsely representing to her that the case had been settled and paying her with his own funds; and for lying to Bar Counsel, at least initially, in the investigation. *See id.* at 1362–65. Four dissenting judges would have imposed a greater sanction, even though Sheehy's conduct (as the Hearing Committee here recognized) was unmarked by aggravating features such as the forgery and misappropriation of funds that respondent's behavior included. *See also In re Moore*, 691 A.2d 1151 (D.C.1997) (three-year suspension of attorney who engaged in multiple acts of dishonesty and also conduct prejudicial to the administration of justice, by directing an attorney in his office to lie to IRS investigators on his behalf and by testifying falsely about his income in divorce proceedings).

The Board considered it important that respondent's course of dishonesty, while admittedly deliberate, stemmed from a perceived need "[t]o extricate himself from litigation that overwhelmed him"—that is, although his "motivation for failing to inform his client about [his litigation] fail-

ures and resorting to the use of a bogus agreement with his client and a forged agreement with the Savino defendants' counsel [was] all too apparent," "[h]is failures were grounded in weakness, not malice, and the means he chose to resolve the predicament in which those failures caught him were self-destructive, not vile or predatory." We need not dispute any of this, and, indeed, in one or more respects—including the remorse with which the Hearing Committee credited him—respondent may present a more sympathetic case than some of those arrayed above. But the fact remains that his actions were among the gravest misconduct the Rules of Professional Conduct prohibit. Even granting some deference to the Board's recommendation, we conclude that an eighteen-month suspension is too lenient for respondent's combined actions of forgery, "concrete and blatant deceit" (the Hearing Committee's words), commingling and misappropriation of client funds, and prejudicial disregard of his client's interests. Our lodestar instead is the three-year suspension for serious misconduct generally reflected in the cases we have cited.[8]

**IV.**

Accordingly, respondent is hereby suspended from the practice of law in the District of Columbia for three years. So long as respondent has filed the affidavit required by D.C. Bar R. XI, § 14(g), the suspension is *nunc pro tunc* to March 30,

---

**8.** At the same time, applying *"Roundtree* factors," *see In re Roundtree*, 503 A.2d 1215 (D.C.1985), and in light of Bar Counsel's obligation to prove the need for a showing of fitness by clear and convincing evidence, *In re Cater*, 887 A.2d 1, 24 (D.C.2005), we accept the Board's recommendation against requiring respondent to show rehabilitation to be reinstated. Facts which the Board found in mitigation, such as his genuine contrition and recognition of wrongdoing; the aberrational nature of his misconduct in a long career as a

lawyer without prior discipline; his fundamentally decent character as testified to by several attorneys; and the remedial steps he has taken in his practice, plainly bear on the need for a fitness showing *vel non*. *See Roundtree*, 503 A.2d at 1217. Although, as we conclude, the gravity of respondent's misconduct necessitates a strong sanction, there does not need to be added to it the additional requirement of a showing of fitness, with whatever further delay in reinstatement that may entail.

2010, when this court suspended him on an interim basis under D.C. Bar R. XI, § 9(g)(2).

*So ordered.*

## APPENDIX

### DISTRICT OF COLUMBIA COURT OF APPEALS

### BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of:

ANDREW J. KLINE, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 358547)

Bar Docket No. 407–05

### REPORT AND RECOMMENDATION OF THE
*BOARD ON PROFESSIONAL RESPONSIBILITY*

\* \* \*

### I. *FINDINGS*

A. *Facts Related to Respondent's Disciplinary Violations*

*Violations Charged in the Specification of Charges*

Respondent formally admitted the violations charged in the complaint and joined Bar Counsel in stipulating to facts that constitute those violations. We adopt the findings of the Hearing Committee, which are supported by substantial evidence in the record, viewed as a whole. *See* Board

---

Rule 13.7; *In re Micheel*, 610 A.2d 231, 234 (D.C.1992).[1] Pursuant to Board Rule 13.7, we have made some additional findings and have cited directly to material in the record, where appropriate, to further support our findings.[2]

1. "Respondent" is a member of the Bar of the District of Columbia Court of Appeals, having been admitted by examination on December 18, 1981, and assigned Bar Number 358547. FF I, ¶ 1.

2. In the summer of 2004, Respondent was in private practice with one associate, a legal assistant and a secretary. FF I, ¶ 2. On August 12, 2004, he brought an action in the Superior Court for the District of Columbia on behalf of his client, The Ad Agency, Inc., against Savino Racine and the Savino Restaurant (collectively, "the Savino defendants"). This action, styled *The Ad Agency, Inc. v. Savino Racine, et al.*, Case No. 04CA006202, sought damages of $7,500 based upon allegations that the Savino defendants had refused to pay The Ad Agency for work it had performed under a contract with the Savino defendants. *Id.* at ¶ 3.

3. The Savino defendants filed an answer on November 1, 2004, which denied the allegations in the complaint and asserted a counterclaim for breach of contract, disparagement and interference with economic relations and claiming damages of $250,000. FF I, ¶ 4. The counterclaim accused The Ad Agency's president and her assistant of disrupting Savino's business by becoming "intoxicated on numerous occasions at Savino's," making "sexual overtures and advances toward[ ] restaurant

---

1. Citations in the form "FF I ___" refer to the findings on pages 6 to 16 of the Committee's report.

2. Hearing exhibits are cited herein as "JX ___," referring to the Joint Exhibit containing the parties' join stipulation of facts, "BX ___," referring to exhibits introduced by Bar

Counsel, and "RX ___," referring to exhibits introduced by Respondent. The single Committee exhibit is cited as "HCX1." The transcript of the first day of hearing is cited as "Tr. I at ___;" the transcript of the second day is cited as "Tr. II at ___."

patrons and employees" and soliciting "drugs from an employee of Savino's." BX 5, Counterclaim at ¶¶ 11, 12 and 13. Respondent filed an answer along with a motion to dismiss the Savino defendants' counterclaim. FF I, ¶¶ 5–6. The answer and counterclaim initially filed by the Savino defendants was dismissed on The Ad Agency's motion, but an amended counterclaim was filed with the same allegations. *See* BX 8, Amended Counterclaim at ¶¶ 11, 12 and 13. Respondent filed no answer to the amended counterclaim. FF I, ¶ 11.

4. On December 27, 2004, the Savino defendants served discovery requests upon The Ad Agency, but Respondent filed no responses on behalf of his client. FF 1, ¶¶ 7–8. The Savino defendants, on February 17, 2005, thus filed a Motion to Compel Discovery. Respondent filed no response to the motion. *Id.* at ¶ 9.

5. The court thus granted the Savino defendants' motion to compel discovery and awarded the Savino defendants $250 for attorneys' fees incurred in preparing the discovery requests and the motion to compel. In its order, the court directed the filing of discovery responses within 10 days and stated that it would "consider imposition of additional sanctions on motion of the Defendant, which may include dismissal of the Complaint, default on the counterclaim or both." FF 1, ¶ 12. Respondent nonetheless filed no responses to the Savino defendants' discovery requests. *Id.* at ¶ 13.

6. On April 5, 2005, the Savino defendants moved for sanctions, requesting the court to dismiss The Ad Agency's claims and enter a default judgment in favor of the Savino defendants on their counterclaim. Respondent did not file a response to the motion. FF 1, ¶ 14. Consequently, the court, on May 10, 2005, entered an order granting the Savino defendants' motion and, *inter alia,* dismissed The Ad Agency's complaint and entered a default judgment on the Savino defendants' counterclaim. The court further scheduled an *ex parte* hearing for the Savino defendants to offer evidence of their damages. *Id.* at ¶ 15.

7. Respondent did not inform The Ad Agency that he had neither responded to the Savino defendants' discovery requests nor filed an answer to the Savino defendants' counterclaim. He also did not inform his client that the Savino defendants had filed a motion for sanctions or that he did not respond to that motion. What is more, Respondent did not inform his client that the court had dismissed its complaint or that a default judgment had been entered in favor of the Savino defendants. FF 1, ¶ 16.

8. Instead, Respondent contacted the Savino defendants' counsel before the *ex parte* hearing was held and negotiated the terms of a settlement of the Savino defendants' claim, under which The Ad Agency would pay the Savino defendants $50,000 and each party would dismiss its claims.[3] Respondent advised his client that he had negotiated a settlement wherein the parties would agree to mutually dismiss all actions with prejudice, but he did not inform his client that the settlement called for a $50,000 payment to the Savino defendants. FF 1, ¶¶ 17–18.

9. On July 12, 2005, the Savino defendants' attorney forwarded to Respondent a settlement agreement executed by the Savino defendants with the terms negotiated with Respondent. FF 1, ¶ 19. Respondent, however, did not present those terms

---

**3.** The agreement also would include a non-disclosure provision and a non-disparagement clause with liquidated damages of $10,000 for each breach. BX 19, ¶ 14.

to The Ad Agency. Instead, he drafted a different settlement agreement, which did not include a provision requiring a payment of $50,000 to the Savino defendants and forwarded that purported settlement agreement to his client for review and execution. *Id.* at ¶ 22. Although Respondent's client was not aware that the settlement agreement executed by the Savino defendants required a payment of $50,000, it nonetheless declined to execute the purported settlement agreement presented to it by Respondent, and directed Respondent to negotiate changes to the agreement. *Id.* at ¶ 23.

10. Respondent, however, on July 13, 2005, sent a check drawn on his own trust account at Bank of America (the "Bank") to the Savino defendants' counsel in the amount of $50,000, purportedly as payment from The Ad Agency in settlement of the Savino defendants' claim against it. The funds in Respondent's trust account which Respondent used to pay the Savino defendants did not belong to The Ad Agency. FF 1, ¶ 20. The Bank honored that check. *Id.* at ¶ 21.

11. Respondent did not abide by his client's direction to negotiate changes to the purported settlement agreement. Instead, he continued to request The Ad Agency to execute the altered settlement agreement he had prepared. The Ad Agency, however, refused to agree to the altered settlement agreement. FF 1, ¶ 24.

12. On or about September 26, 2005, Respondent forged the signature of The Ad Agency's chief executive officer and president upon the original settlement agreement signed by the Savino defendants on July 12, 2005. Respondent had no authority to sign the settlement agreement on behalf of his client and did not advise his client that he had done so. FF 1, ¶ 25.

13. The Ad Agency thereafter retained new counsel to represent it in connection with the matter, who learned that Respondent had settled The Ad Agency's claim against the Savino defendants and reported Respondent's conduct to The Ad Agency and to Bar Counsel. FF 1, ¶ 26.

*Violations Charged During the Hearing—Misappropriation and Commingling*

14. In connection with its investigation of the matter, Bar Counsel obtained from the Bank copies of Respondent's trust account records for the year 2005. FF 1, ¶ 27. Those records showed that, on July 15, 2005, after the Bank honored Respondent's $50,000 check to the Savino defendants, Respondent's trust account had a balance of $9,671.33. The balance in Respondent's trust account stood at the same amount three months later when Respondent, on October 26, 2005, wrote two checks against the trust account. *Id.* at ¶¶ 28–30. The first check, number 2290, was payable to C & D Incorporated, in the amount of $5,500 and bore a notation stating, "[f]unds held in escrow for tax clearance." *Id.* at ¶ 29. The second check, number 2291, was payable to Cholok Incorporated, in the amount of $8,513.86. It bore a notation stating, "[r]ebate of funds in escrow/tax clearance." *Id.* at ¶ 30.

15. Respondent did not have permission from either C & D or Cholok to make use of their funds. FF 1, ¶ 32. The funds in Respondent's trust account, however, were insufficient to pay Respondent's checks to those firms, which totaled $14,013.86. *Id.* at ¶ 31. To clear those checks, Respondent, on October 28, 2005, deposited $5,000 into his trust account, raising the account balance to $14,671.33.

*Id.* at ¶ 33.[4]

16. On November 7, 2005, the Bank honored the $5,500 check to C & D, and on the next day, the Bank honored the $8,513.86 check to Cholok. FF 1, ¶ 34. After these two checks cleared, the balance in the trust account was $657.47. Had Respondent not deposited $5,000 into his trust account on October 28, 2005, the account funds would have been insufficient to cover both checks. *Id.* at ¶ 35.

17. Bar Counsel could not determine from a review of Respondent's trust account records whether the $50,000 Respondent used to satisfy the Savino defendants' settlement were Respondent's funds or funds belonging to Respondent's clients. FF 1, ¶ 36. Respondent produced no ledger or other such record to identify the source of funds received and how the funds in the account were disbursed. *Id.* Further, checks Respondent issued on his trust account, both to himself and others, frequently did not bear any notation as to the purpose of the check. *Id.*

18. In response to Bar Counsel's prehearing inquiry concerning Respondent's use of trust account funds for the the Savino defendants' settlement, Respondent represented on June 15, 2006, that the funds contained in the trust account used to fund the settlement were his. FF 1, ¶ 37. When Bar Counsel's investigator could not confirm that representation, Bar Counsel asked Respondent to explain—

(1) the basis for [his] representation that the funds used by [him] to fund the the Savino [defendants] settlement belonged to him, and provide copies of all documents that refer or reflect upon [his] statement;

(2) the source of the October 28, 2005, $5,000 deposit and provide copies of any documents that refer or reflect upon [his] explanation; and

(3) explain, in detail, why [his] trust account did not contain funds sufficient to release to C & D Incorporated and Cholok Incorporated the funds held "in escrow for tax clearance" prior to the October 28, 2005, $5,000 deposit.

*Id.* at ¶¶ 38–39.

19. In November 2006, following Bar Counsel's delivery of the Bank's trust account records to Respondent and review of those and other records by a certified public accountant ("CPA") retained by Respondent, Respondent, through counsel, replied to Bar Counsel's request for information, stating as follows:

There are records missing which affect our response to your August 21, 2006, letter.

It is becoming clear that the disability identified in Dr. Ratner's May 3, 2006 report is the problem.

FF 1, ¶ 40.

20. Respondent personally maintained all the financial records of his law practice by use of a Quicken computer software program. FF 1, ¶ 41. Transactions in the firm's accounts were downloaded from the Bank into Respondent's Quicken program. Respondent would then insert information in the memo section. *Id.*

21. Respondent testified that he could not produce the records Bar Counsel had requested concerning the handling, maintenance, and disposition of entrusted funds because the hard drive on his laptop computer, which contained such records, had crashed at the end of February or the beginning of March 2005, and he had kept no backup of the data on his computer.

4. Bar Counsel was unable to determine the source of the $5,000 deposit from the records provided by Respondent or from the Bank. Tr. I at 30, 52–53, 55.

FF 1, ¶ 42. Further, although Respondent claimed he had worked with a CPA in an attempt to reconstruct the records, he was unable to do so and, "at the end of the day, [Respondent] finally just sort of threw up [his] hands." *Id.*

22. Respondent also testified that when the computer crashed, he sent it to his technology service provider who arranged for a data recovery firm to try to recover the information that was on the hard drive, but that they were unable to do so. FF 1, ¶ 44. Respondent had no contract with the data recovery firm, there was no fee because the service was to be paid only if the data was recovered, and Respondent could not recall whether he had any receipts or anything that would corroborate the transaction. *Id.*

23. From January 1, 2005 until November 8, 2005, Respondent's trust account contained funds belonging to his clients. FF 1, ¶ 45. Respondent claimed in his testimony that from at least January 1, 2005 through July 15, 2005, his trust account also contained approximately $50,000 belonging to him as earned legal fees that he had failed to remove from his trust account because he "just hadn't gotten around to" transferring the funds to his personal or operating account. *Id.* Respondent claimed that he would be the only person who could categorize and describe the $51,000 that was in the trust account in at the beginning of 2005, but offered no evidence to support his representations concerning the amount of money in the account that belonged to him. Indeed, he acknowledged that the CPA he had retained was unable to confirm through his review of the same records Respondent had provided to Bar Counsel that the $50,000 Respondent used to fund the Savino defendants' settlement were funds belonging to Respondent. *Id.* Re-

spondent, however, claimed to have had independent knowledge of the funds in his trust account on January 1, 2005 due him as fees, but which had not been withdrawn when his computer crashed. *Id.* Respondent acknowledged the contradiction between his claim and his alleged inability to reconstruct the account: "I have the time and billing records in terms of fees that were due, and basically I know what fees were paid, or I believe I know with some degree of certainty, not with precision, if I did then the account would have been able to be reconstructed, all of what generally was due to me at the time." *Id.*

24. Respondent testified that he was uncertain after the computer crash what escrowed funds were still due clients from his trust account. Thus, he set up a new trust account at a different bank "and didn't put any more money in the [old trust] account and didn't do anything with the account for several months ... to confirm that understanding [i.e., that the funds remaining in the account were his]. If someone had come to [him] and said I am due money, then [he] would have realized that there was a claim, and indeed that did happen in October or November of 2005. Since then [he hadn't] had any request from any client with respect to fees that were due from the trust account prior to February of 2005 when [he] set up the new account...." FF I, ¶ 46. Respondent testified that as of the date of the hearing he still had about $1,000 in the account, and was "not exactly sure what to do with the money at this point, so [he had] not closed it out." *Id.*